**Gertrude REMINGA, Executrix of the Estate of Thomas H. Reminga, Deceased, and Barbara Sue Breeden, Executrix of the Estate of James Robert Breeden, Deceased, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. K60–71 C.A.

United States District Court, W. D. Michigan, S. D.

Jan. 19, 1978.

Volkema & Pees, Russell H. Volkema, Columbus, Ohio, of counsel, Walsh & Barnes, Richard C. Walsh, Kalamazoo, Mich., of counsel, for plaintiffs.

Robert C. Greene, Asst. U. S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

FOX, Chief Judge.

This case is brought under the Federal Tort Claims Act, 28 U.S.C. § 1346 *et seq.* The action arises out of an accident which occurred on November 17, 1968, when plaintiffs' decedents died in a crash caused by their light aircraft flying into a guy-wire of a tall television broadcasting tower located near Rhinelander, Wisconsin. Plaintiffs are Gertrude Reminga, wife of Thomas H. Reminga and executrix of his estate; and Barbara Sue Breeden, wife of James Robert Breeden and administratrix of his estate.

The respective claims herein were timely filed with the appropriate federal agency. Final administrative action was taken on these claims, and this action was timely filed in accordance with 28 U.S.C. § 2675, therefore giving this court jurisdiction of this action.

Plaintiffs base their claim for recovery on several different grounds:

(1) The United States was negligent in that it improperly marked the tower in question on the official sectional air map.

(2) The government failed to issue a Notice to Airmen (NOTAM) warning pilots of the alleged misplacement.

(3) The government improperly granted permission for the construction of this tower.

(4) The government failed to issue a NOTAM warning that the tower in question had "unusually long" guy-wires.

(5) The Federal Air Administration (FAA) and the Federal Communications Commission (FCC) failed to require proper marking of the television tower.

The Government asserts that plaintiffs failed to meet their burden of proof in several respects concerning duty, breach thereof and proximate cause, and that allegations concerning the failure to regulate fall within the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a).

The Government further asserts that the sole proximate cause of the accident was the negligence of all of the occupants of the airplane in commencing and continuing the flight in dangerous weather conditions, and that such conditions were the cause of their inability to see and avoid the obstacle in question.

After extensive discovery, the matter was set for bench trial on November 15, 1976. The parties filed both pre-trial and post-trial proposed findings of facts and conclusions of law. At the close of trial the record was left open so that the parties could take and submit the depositions of two young eyewitnesses to the accident. This step was necessary to prevent prejudice, as neither party had fully complied with the court's pretrial order to list witnesses to be advanced at trial. These depositions were filed December 13, 1976. Based upon the testimony given at trial, the evidence introduced, and the stipulated facts presented to this court by the parties, I make the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

*I. Facts Surrounding the Crash.*

1. Gertrude Reminga is the Executrix of the Estate of Thomas H. Reminga, deceased; she is the widow of Thomas H. Reminga, deceased, and Thomas H. Reminga was the father of three children, whose ages at the time of death were as follows:

Thomas—21 years; Susan—17 years; and Mary—15 years.

2. Barbara Sue Breeden is the Executrix of the Estate of James Robert Breeden, deceased; she is the widow of James Robert Breeden, deceased, and there is no issue from this marriage.

3. Thomas H. Reminga was 44 years of age at the date of his death, and his life expectancy, according to life tables of the United States Vital Statistics, was 28.2 years.

4. James Robert Breeden was 29 years of age at the date of his death, and his life expectancy was 41.7 years.

5. Thomas H. Reminga and James Robert Breeden were citizens and residents of the State of Michigan at the time of their deaths, and their respective families were likewise residents of the State of Michigan.

6. During the course of their business Thomas H. Reminga and James Robert Breeden had dealings with the Cadillac Company, Inc. (now Shustrom Company, Inc.). This company owned a Mooney M–20C, single engine, four seat aircraft, which was primarily for the use of the company owner's son, Mr. Jerome Shustrom, who like Mr. Reminga and Mr. Breeden held a private pilot's license.

7. None of the three men were instrument rated; that is, none of the men were qualified and certified to fly an aircraft using only instruments for navigation. 14 C.F.R. 91.115–91.129. Neither Mr. Reminga nor Mr. Breeden was checked out (and hence neither was qualified) to be a pilot in command of the above aircraft.

8. At the time of the accident, Mr. Thomas H. Reminga held a private pilot's license and had accrued approximately 1000 hours of flying time. He was a military pilot during World War II and had a commercial pilot certificate with a multi-engine rating. James Robert Breeden held a private pilot's license with a single-engine rating. Additionally, he had attended commercial ground school and had his commercial pilot's rating almost completed. He had accumulated 515 hours of flying time.

Jerome Shustrom held a private pilot's license with a single-engine rating, and had accumulated approximately 187 hours of flying time.

9. Plaintiffs' decedents and Jerome Shustrom had flown to Wisconsin on a hunting trip. They departed from Land O'Lakes Airport in Wisconsin on November 17, 1968 at approximately 2:30 P.M. C.S.T. intending to return home to Kalamazoo, Michigan. This flight was to be conducted in accordance with Federal Aviation Administration General Operating and Flight Rules, 14 C.F.R. 91.–91.51 and Visual Flight Rules (VFR), 14 C.F.R. 91.115–91.129.

10. Jerome Shustrom occupied the left front seat, commonly known as the pilot's seat, Thomas H. Reminga was in the right front seat, and James Robert Breeden was in one of the rear seats when the men departed from Land O'Lakes Airport. Because Mr. Shustrom was sitting in what is commonly acknowledged as being the pilot's seat, because his father's business owned the aircraft, and because neither of the plaintiffs' decedents was checked out to fly the aircraft, the preponderance of the evidence points to the fact that Mr. Shustrom was in fact the pilot of the airplane.

11. Seventeen miles south-southeast of the airport the airplane carrying the three men collided into a guy-wire of a 1720 foot broadcasting tower. The guy-wire was struck at an approximate altitude of 450 feet above ground level, and about 1850–1900 feet from the base of the central part of the structure. As a result of this collision, the airplane crashed, and plaintiffs' husbands were killed. The accident occurred at approximately 2:52 P.M. C.S.T.

12. The center part of this television broadcasting tower was lighted, but the guy-wires were neither lighted nor marked. The tower was not a free-standing tower; it was supported by guy-wires that extended in three directions from near the top of the 1720 foot tower to anchors approximately one-half mile away from the base of the tower.

13. Federal Aviation Regulation (FAR) 91.3, 14 C.F.R. § 91.3, states that the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. Since it has been determined that Mr. Shustrom was the pilot of the plane involved in this action, he assumed this responsibility.

14. In executing his responsibilities under FAR regulations, the pilot in command has certain limitations within which he must operate his aircraft. He is under greater restrictions within a control zone than he is outside such zone. In either case he must adhere to the flight minimums set forth by the FAR regulations, unless he is faced with an emergency, whereupon he must use his best judgment.

15. The flight minimums which Mr. Shustrom had to comply with in order to be legal were: (1) be free of clouds, and (2) have one mile visibility, so long as he flew outside of controlled airspace:

"Outside controlled airspace at an altitude of 1,200 feet or less above the surface, unless the aircraft is *clear of clouds*.

"Outside controlled airspace, unless flight visibility is at least *one statute mile*." (F.A.R. § 91.105(a) (Emphasis added).

Mr. Shustrom was flying less than 1,200 feet at the site of the accident and the flight was outside of controlled airspace. (FAR 91.105; 14 C.F.R. 105). Further, the tower structure was located outside of the control zone of the Rhinelander Oneida County Airport control zone.

16. 14 C.F.R. 91.5 states that a pilot in command shall, before beginning the flight, familiarize himself with all available information concerning that flight, including available weather reports and forecasts and alternatives in the event the planned flight cannot be completed.

17. The weather conditions, as shown by the weather reports, the defendant's answers to plaintiffs' requests for admissions, and the testimony of Mr. Leslie N. Krosschell, were above the minimums required by the regulations at takeoff.

Prior to the flight at 1:37 P.M. C.S.T., an occupant of the airplane, who identified himself as a pilot, called the flight service station at Wausau, Wisconsin for flight information and a weather briefing; during this call the flight service station at Wausau, Wisconsin asked the caller if he could make the flight under instrument flight rules, to which the caller replied, "No." During this call to the flight service station at Wausau, Wisconsin, the person who called was given the current Rhinelander and Wausau weather reports and terminal forecasts for Wausau, whereupon the caller stated that he was undecided as to whether or not to go and that he would call again.

The Rhinelander weather, as reported at 12:45 P.M. C.S.T. was overcast 800 feet estimated, visibility 3 miles, very light snow, fog, a temperature of 32° Fahrenheit, wind from 090° at 5 knots, a dew point of 29° Fahrenheit and an altimeter setting of 29.76 inches of mercury. The Wausau weather as reported at 1:00 P.M. C.S.T. was a ceiling of 300 feet, indefinite with obscuration visibility of 1½ miles, light rain, light drizzle, fog, a temperature of 36° Fahrenheit, a dew point of 35° Fahrenheit, a wind from 120° at 8 knots and an altimeter setting of 29.72 inches of mercury and rain which began at 12:48 A.M. C.S.T. (Dew point is the temperature to which the air must be cooled to become saturated and is of significance to the pilot in that when the temperature reaches the dew point, water vapor can no longer remain invisible, but is forced to condense, becoming visible on the ground as dew or frost, or appearing in the air as fog or clouds, or falling to the earth as rain, snow or hail. Pilots are taught to expect that when the temperature and dew point are within 4 degrees of each other that precipitation or fog may be expected and that it will restrict visibility.)

18. Because the weather was worse over Northern Wisconsin, Northern Lake Michigan, and Northern Michigan, the decedents probably intended to fly south to the Chicago area and from there to Kalamazoo, Michigan. Plaintiffs introduced evidence that in fact the weather may have been improving to the south:

AIRMET Echo 15. Valid 1150–1600: over the northeast three-quarters of Wisconsin, Upper Michigan, Lake Michigan, and the north three-quarters of Lower Michigan ceilings generally below 1000 feet and occasional visibilities below 2 miles. Conditions slowly improving from the south but conditions continuing over the northeast two-thirds Wisconsin, Upper Michigan, north and central Lake Michigan, and the north two-thirds of Lower Michigan through 1600. Continue advisory beyond 1600.

An AIRMET identifies to the pilot the existence of weather phenomenon that is important to the safety of light aircraft and covers such things as moderate icing, moderate turbulence, existence areas of visibility less than two miles and/or ceilings less than 1000 feet.

19. The weather in the area where the aircraft crashed was marginal for flying.

At 2:45 P.M. C.S.T. the weather reported at Rhinelander was 600 feet overcast as measured by balloon, visibility of two miles, very light snow, fog, temperature of 33° Fahrenheit, dew point of 31° Fahrenheit, wind from 090 degrees at 4 knots, altimeter setting 29.77 inches of mercury.

The Wausau weather at 3:00 P.M. C.S.T. was estimated 700 feet overcast, 10 miles visibility, 36° Fahrenheit, dew point 36° Fahrenheit, wind 220° at 05 knots, altimeter setting 29.71 inches, rain ended at 2:15 P.M.

However, the airplane was flying above minimal flying conditions. Mr. Shustrom in fact confirmed that he was flying within the legal limits when he reported back by radio after he was twelve miles out from the Land O'Lakes Airport that he was at 600 feet, with three miles visibility. He also had to be free of clouds at that time in order to have three miles visibility.

20. The manager of the Land O'Lakes Airport, Leslie Krosschell had a commercial pilot's rating for single and multi-engine aircraft and was a certified flight instructor. At the time of departure of the plane, he observed the ceiling at the airport to be approximately 600 feet with variable visibility from 1 to 3 or 4 miles, and was able to pick out snow storms in the areas surrounding the airport, although there was no snow storm at the airport at the time of the departure. Prior to the flight, he advised at least one of the occupants of the aircraft that they should obtain additional weather information from the pilot of an incoming flight which was being flown under Instrument Flight Rules and Regulations.

After this incoming plane had completed its landing, it turned around on the active runway towards the taxiway on which the subject aircraft was waiting. It continued to taxi off the active runway onto the taxiway and in doing so passed by the subject aircraft at a distance of approximately 25–30 feet. At that point Leslie Krosschell observed the landed aircraft to have ice accumulations. The significance of this fact lies in the implication that weather conditions were conducive to icing on an aircraft, a dangerous condition for small planes. However, under VFR flight rules a pilot is forbidden to fly in clouds. This plane which had landed was flying IFR (on instruments) through the clouds, and it was this that was probably responsible for the icing conditions. Because the pilot of the plane involved in this action, when he reported back to Land O'Lakes Airport at the 12 mile point (5 miles from the scene of the accident) did not report icing conditions, but did report visibility of 3 miles, the preponderance of the evidence establishes that there was no icing on the aircraft before the crash.

21. The weather conditions were marginal enough to prevent two instrument rated pilots from deciding to take off. Additionally, both of plaintiffs' experts agreed that the decision to take off in such weather may have been poor judgment.

22. All three persons aboard the aircraft were experienced pilots and knowledgeable enough to be deemed to have participated equally in the gathering of weather information, navigation, and the decision to depart from Land O'Lakes on the fatal flight.

23. One eyewitness to the accident, Ronald Dickinson, age seven at the time of the accident, was playing outside his house located one mile south, southeast of the tower. His attention was drawn to the plane because it "sounded pretty low" and he observed it flying in and out of clouds. It was foggy at the time of the accident with a mixture of snow and rain falling. At least half the tower was obscured by clouds and the guy-wires were not visible due to the weather conditions. Only the bottom tower lights were. visible. The plane was obscured by clouds from Dickinson's vision at the time of the accident, although he did hear it strike the guy-wire.

24. A second eyewitness, Julie Zdroik, was eight years old at the time of the accident and lived 1 and ¼ miles northeast of the tower. She, too, remembers that less than half the tower was visible due to the clouds and that only the lower lights on the tower were visible. Due to the weather conditions the guy-wires, normally visible in good weather, could not be seen very well. Zdroik recalls seeing the plane from the time it flew over her until it struck the guy-wire. She also remembers the plane going "up and down" until it hit the wire. She confirms that snow was falling at the time of the accident and at times the ground fog and low clouds would merge.

II. *Facts as to the Allegedly Improper Marking of the Official U.S. Aeronautical Map.*

25. Before the flight, one of the occupants of the subject aircraft asked Leslie Krosschell of Land O'Lakes Airport to purchase a current U.S. Aeronautical Sectional Chart for the local area, but was told that there were none available. Instead Mr. Krosschell gave to the occupants of the subject aircraft a then current State of Wisconsin Aeronautical Chart published· by the Williams and Heintz Map Corporation. The State of Wisconsin chart was intended by its printers for use in aerial navigation and could be used for that purpose.

26. The United States Government disseminated its aeronautical maps covering the Green Bay area, the area wherein the accident occurred, in the states of Wisconsin and Michigan during the years of 1967 and 1968.

27. The location of the subject antenna structure was inaccurately depicted on the 1967 Green Bay Sectional Chart put out by a department of the United States Government. Although the Green Bay Sectional Chart depicted the tower as being west of the town of Starks, Wisconsin, and south of the railroad tracks, the actual location of the tower was north of Starks and north of the railroad tracks. The reason for the error was that the Sectional Chart depicted the location of the tower as it was originally planned. However, the actual location of the tower was moved for engineering reasons.

28. Apparently the 1967 Green Bay Sectional Chart showed the location of the tower as originally proposed and was not changed to show the actual location until some time after the accident in question here.

No evidence was introduced to show that the displacement was corrected on the 1968 Green Bay Sectional Chart. In fact, the 1968 Chart, which would have been current for use at the time of the accident, showed the same displacement of the tower.

29. The displacement was material because it was on the wrong side of railroad tracks which pilots often use as reference points when flying by visual flight rules (VFR). The erroneous marking of this tower on the aeronautical maps normally used by pilots constitutes a real and foreseeable danger to pilots flying VFR.

30. The same error in placement of the tower was made on the State of Wisconsin Chart received by plaintiffs' decedents.

31. The type size on the Sectional Chart of the elevation figure for the subject tower indicates that it is one of the highest obstructions on the chart.

At the time of the accident there were also marked on the Wisconsin Aeronautical Chart towers located in Northern Wisconsin of 1625 feet located north of LaCrosse, Wis-

consin; of 1166 feet located south of Green Bay, Wisconsin; and of 2000 feet located southwest of Eau Claire, Wisconsin.

32. The Green Bay Sectional Chart covers only Northern Wisconsin and the Northern Lower Peninsula of Michigan. The Wisconsin Aeronautical Chart covers all of Wisconsin and includes Northern Illinois and the Chicago area. Either chart was perfectly acceptable for use in navigation, although many pilots prefer the Sectional Charts over State Charts.

33. The Wisconsin Aeronautical Chart may have been used by the occupants of the plane to navigate towards the Chicago area, which is not mapped on the Green Bay Sectional. This is because the weather sought of plaintiffs' area was improving. See finding of fact # 18.

34. Barbara Breeden had returned to her, at some time shortly after the accident, a briefcase belonging to her husband which had evidently been aboard the aircraft in question at the time of the accident. Mrs. Breeden was unable to trace the chain of custody of this briefcase and map. Inside the briefcase was a Green Bay Sectional Chart, neatly folded, which shows a displacement of the subject tower. This map was marked as obsolete for use in navigation after December 7, 1967.

35. There was evidence introduced that the pilots always carried a standard U.S. government sectional map when flying. The pilots arrived at the Land O'Lakes Airport without the use of the Wisconsin map, therefore in all probability they had the old sectional in use, (the one which was returned to Mrs. Breeden) which placed the tower in the same location as the current sectional.

36. Before take off from the Land O'Lakes Airport the pilot, Jerome Shustrom, was warned not to go inside of the control zone at the Rhinelander Airport, which in turn would most probably force the pilot to fly in the area of Starks, the area where the tower was located.

There is evidence that if the pilot was cognizant of the town of Starks and of the relative geographical relationship of the tower on the aerial maps, that pilot would not be negligent in flying on the east side of Starks, the side where in fact the tower was located.

37. The U.S. Sectional Chart for Green Bay was used as a source of reference in the production of the Wisconsin aeronautical map, and the error on the Wisconsin map is identical to that on the Sectional Map. Hence it is reasonable to conclude that the error on the Green Bay Sectional Chart was responsible for the error in placement of the tower on the Wisconsin state map.

### III. Failure to Warn of Such Improper Marking.

38. At no time was a NOTAM published warning pilots of the construction or presence of this 1700 foot tower and supporting guy-wires.

39. At no time was a NOTAM published warning of the displacement of the tower on the Sectional Chart.

40. There is no evidence that it is common practice for the FAA to issue NOTAMs regarding the presence of communications towers already charted on the Section Chart.

41. There was no evidence presented that NOTAMs are used to warn pilots of navigational chart errors such as occurred here.

### IV. Facts as to the Allegedly Improper Grant of Permission for Construction of the Tower.

42. The subject tower was owned and operated by Northland Television, Inc. (Northland). Northland's president and sole stockholder was Congressman Alvin E. O'Konski. It is an understatement to say that Congressman O'Konski attempted to use his position to influence and speed the granting of the necessary permits from the FAA and FCC for the construction of the tower.

Congressman O'Konski prominently displayed as his return business address on the

application forms his House Office Building address. Congressman O'Konski sent letters to the FAA officials on his Congressional stationary asking for "priority" on the matter and reminding them of the support he had given the FAA during his 23 years in Congress. The application was referred to officially in the FAA notices as the application of Congressman O'Konski rather than as the application of Northland.

This type of dealing with government agencies is improper.

43. Congressman O'Konski received a determination of "no hazard" from the FAA on June 15, 1965 for the originally proposed location of the tower, one-tenth mile west of Starks, Wisconsin. Due to engineering requirements, the location of the tower had to be changed to one-tenth mile north of Starks, Wisconsin. A new determination was made by the FAA on March 28, 1966 that the new location "would have no adverse affect on aeronautical operations, procedures or minimum flight altitudes" as compared to the originally planned location and would present "no hazard" to air navigation in the area, "provided the structure is obstruction marked and lighted in accordance with FAA standards."

44. Before building the proposed tower, the FAA, in conformity with 14 C.F.R., Part 77, solicited the general aviation public in connection with its determination of no hazard for the construction of the proposed tower, whereupon it received various objections and concurrences to the building of the proposed tower.

The Airline Pilots Association on March 11, 1965, wrote to the Chief of the Air Space Branch, Air Traffic Division, of the Federal Aviation Agency stating that "the Airline Pilots Association objects to the erection of this tower and the proposed site because of the extreme hazard of (sic) all aircraft operating in the vicinity of Rhinelander, Wisconsin, and on the direct route between Rhinelander and Iron Mountain. * * * A tower of this height must be located where airplanes seldom, if ever, fly. * * * "

The Gran-Aire, Inc. of Milwaukee, Wisconsin, objected on February 24, 1966, to the FAA as follows: "Gentlemen: During the original aeronautical study on this proposal I offered no objection and in fact gave my tacit approval. However since than I have been advised that the tower would not be a rigid self-sustaining tower but would be supported by long guy-wires. *These guy-wires* supporting a tower that is excessively high above ground *greatly enhances* (sic) *the probability of a collision by a VFR aircraft during marginal weather conditions.* The hazard will exist the year around but will jeopardize flying vacationers the warmer seasons when they fly in great numbers through this area. Flying during good weather requires all the skills of a private pilot over this terrain. My objection is offered. W. J. Lotzer." (Emphasis added.)

The Aircraft Owners and Pilots Association, Washington, D. C., in a letter to the FAA wrote " * * * There are some 2440 private and business aircraft owned by citizens of Wisconsin, many of whom would be exposed to the hazard of such a tall structure. To the immediate south in Illinois, there are some 5800 privately owned aircraft. To the east and to the west we have Michigan 5150 general aviation aircraft, with 3270 more owned by citizens of Minnesota. Many of these aircraft can also be expected to be exposed to this hazard. While these 16,600 aircraft are located nearby, it should be remembered that any of the more than 110,000 aircraft in the United States General Aviation Fleet can, and many do, bring vacationers through this area.

"The Aircraft Owners and Pilots Association, a non-profit corporation, established to represent the interests of the private and business aircraft owner and pilot, objects on behalf of our more than 127,000 members, to the construction of a 1707 foot high structure as proposed. Our objection would be withdrawn if the proposed structure is reduced in height to 1029 feet above the ground."

In addition to the above, there were other objections as well as inter-agency communications which expressed great concern about the tower being built too close to the railroad and highway which they recognized were identifying routes for VFR pilots.

45. Congressman O'Konski apparently had the approval of North Central Airlines, Oneida County officials, Oneida County Airport officials, the Regional Manager of the Air Transport System, and the President of the Wisconsin Professional Aviation Association.

46. The FAA in a release dated March 8, 1965, made a statement of approval which this Court determines was inconsistent with the evidence before it and which indicated favoritism to the applicant. The report said:

"Such a structure will be a definite hazard to non-IFR general aviation aircraft because of aviation activity in the area when ceiling and visibility are down. The real problem is when the pilot who becomes lost or confused which can happen so easily in the north woods (sic). However television is also very important to the many residents and tourists in the north that I feel it's worth the *chance so long as it remains the only one to be approved.*" (Emphasis added.)

47. The FAA is limited in its authority to control the construction of such broadcast towers. The FAA is authorized to conduct aeronautical studies to determine the effect of a proposed tower on air navigation. 14 C.F.R. § 71.31. If the FAA determines that the antenna presents no hazard, then the FCC will proceed to determine the application for radio station authorization without further considering its effect upon air navigation, 47 C.F.R. § 17.-4(d) (1972). If the FAA determines that the tower will be a hazard, "the Commission will take further appropriate action." 47 C.F.R. § 17.4(e) (1972). Thus although neither the FAA nor the FCC is authorized to prohibit the construction of such a tower *per se*, the FCC is authorized to determine whether a license for the *use* of such a tower for radio broadcasting should be granted, and included within such a determination is whether the tower has been found by the FAA to be a hazard to navigation. Assuming that the tower is intended to be used for radio and/or television broadcasting, such a denial of a broadcasting license by the FCC on the basis of the FAA hazard determination is in effect a denial of construction of the tower by the FCC.

*V. Facts as to the Alleged Failure of the FAA to Require Proper Markings on the Tower.*

48. The tower could probably be seen for a distance of at least ten miles when visibility is not a problem.

49. The tops of the guy-wires and the tower were completely covered with clouds at the time of the accident.

50. The steel structure part of the tower was painted with alternate bands of red and white paint, and had lights installed on it. These lights included flashing lights, and were operating at the time of the accident.

51. The guy-wires on the tower were neither painted nor had lights attached.

52. The FAA through its publications to pilots warns them of the dangers of tall communications towers and their attached guy-wires.

53. These guy-wires become almost invisible under marginal weather conditions.

54. The FAA does not require specific lighting on towers because it does not have the authority to do so. However, the FAA does put out recommendations as to lighting, FAA Advisory Circular AC 70/7460-1 entitled "Obstruction Marking and Lighting."

55. The Federal Communications Commission (FCC) does require specific lighting of antenna structures, 47 C.F.R. § 17.21; 47 C.F.R. § 17.35. The latter regulation requires a beacon at the top of the structure, flashing beacons spaced along the antenna and placed "within the tower proper," and red obstruction light globes spaced intermittently along the tower and "installed on each outside corner of the structure." The

FCC lighting regulations are identical to the FAA recommendations for lighting.

56. These FCC regulations define "antenna structures" as including "the radiating system, its supporting structures and any appurtenances mounted thereon." 47 C.F.R. § 17.2.

57. The FCC has the power to require additional lighting on an antenna:

"If an antenna installation is of such a nature that its painting and lighting in accordance with these specifications are confusing, or endanger rather than assist airmen, or are otherwise inadequate, the Commission will specify the type of painting and lighting or other marking to be used in the individual situation."

47 C.F.R. § 17.22.

58. The FAA in an advisor circular, AC 70/7460–1, dated 2/29/68, stated that "the FAA will recommend appropriate marking in an area where towers, poles, and similar obstructions are so grouped as to present a common hazard to air commerce; where the hazard of a particular obstruction is increased by guy-wires or other appurtenances; or where invisible' hazards to aircraft in flight may exist."

59. There is no policy by the FAA at the present time to require lights or other markings on guy-wires supporting broadcast towers.

VI. Facts as to the Failure to Issue a NOTAM Warning of the Unusually Long Guy-wire.

60. The FAA had issued no Notice to Airmen (NOTAMs) warning pilots of the long guy-wires present on this broadcasting tower.

61. NOTAMs are intended to handle "time critical information which would affect a pilot's decision to make a flight," according to the Flight Services Manual published by the FAA. Examples of such temporary hazards or new obstructions given in the manual include obstruction warning light outages, airport light outages, bird activity, aircraft jettisoning fuel, and new construction such as TV towers and tall buildings for which no obstruction lighting has been installed yet.

62. The existence of the unusually long guy-wires on this particular tower were in place long enough to have disseminated this information to pilots by other means than by NOTAMs; there existed no such time critical need as to require the use of NOTAMs.

VII. Facts as to Damages.

63. At the time of his death, Mr. Thomas Reminga was self-employed in the Valley City Enterprises in Kalamazoo, Michigan. He was a stockholder in this company along with James R. Breeden and a Mr. Charles Keckler. Reminga was president of the company.

64. Decedent Thomas Reminga and plaintiff Gertrude Reminga had never been married to any other spouse at the time of death.

65. Decedent James Robert Breeden and plaintiff Barbara Breeden had never been married to any other spouse at the time of death.

66. Thomas H. Reminga was the father of three children, whose ages at the time of death were as follows: Thomas, 21 years; Susan, 17 years; and Mary, 15 years.

67. James Robert Breeden had no children.

68. Thomas H. Reminga was 44 years of age at the time of his death; the life expectancy according to the life tables of the United States Vital Statistics of a man 44 years old. is 28.2 years.

69. James Robert Breeden was 29 years old at his death. The life expectancy of a 29 year-old man is 41.7 years.

70. The combined income tax returns for James R. and Barbara Breeden from 1964 through the accident are as follows:

| | |
|---|---|
| 1964 – | $10,179.10 |
| 1965 – | 10,948.54 |
| 1966 – | 11,326.15 |
| 1967 – | 5,554.19 |
| 1968 – | 9,996.43 |

The average income for James Breeden therefore in this five-year period was $9,601.00.

71. The combined income tax returns for ten years prior to the accident indicate that Thomas H. Reminga had an average income of $10,135.00 for that period.

72. The plaintiffs each received the sum of $25,000.00 from the Cadillac Company, Inc. (now the Shustrom Co., Inc.) because of the accident.

73. It is established that the decedents were reasonably successful in their business operations, and would probably have continued to prosper therein over the years.

74. The children of Thomas Reminga were deprived of the guidance and support of their father by reason of this accident and his resulting death.

75. Similarly, Marjorie Breeden, the mother of James Breeden, was deprived of the services and companionship of her son as a consequence of this accident and his resulting death.

### CONCLUSIONS OF LAW

*I. Conflict of Laws.*

This court has jurisdiction of the action under 28 U.S.C. § 1346 *et seq.*, commonly referred to as the Federal Tort Claims Act.

An initial question which faces this court concerns a conflict of laws. On January 24, 1975, this court denied the government's motion to strike and/or reduce the ad damnum clause of plaintiffs' complaint; the government had argued that the Wisconsin wrongful death statute, W.S.A. §§ 895.04–.05 was applicable. If so, this statute would have substantially limited plaintiffs' possible recovery. As the following analysis will show, this court believes that Michigan law is applicable.

Under 28 U.S.C. § 1346(b), liability under the Tort Claims Act is to be imposed on the government only where the government ". . . would be liable to the claimant in accordance with the law of the place where the act or omission occurred." The focus in this case, therefore, is upon Wisconsin law. This section of the Act has been construed, however, to require the "whole law" of the state of the accident to be applied, including its choice of law rules. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); *Gowdy v. United States,* 412 F.2d 525 (6th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969).

Wisconsin courts have abandoned the rule of *lex loci delicti* in choice of law for tort cases. Wisconsin first adopted a two-tiered analysis which began with a combination of "significant contacts" and "interest analysis" theories and then proceeded to "qualitative analysis," beginning with a "weak presumption" in favor of *lex fori* and guided by Professor Robert Leflar's five choice-influencing factors. *Decker v. Fox River Tractor Co.,* 324 F.Supp. 1089 (E.D.Wis. 1971); *Heath v. Zellmer,* 35 Wis.2d 578, 151 N.W.2d 664 (1967); *Wilcox v. Wilcox,* 26 Wis.2d 617, 133 N.W.2d 408 (1965).

In *Hunker v. Royal Indemnity Co.,* 57 Wis.2d 588, 204 N.W.2d 897 (1973), the Wisconsin Supreme Court recognized that this method of analysis was a "redundancy" and stated that:

> "While the *Wilcox* analysis well served its purpose where once made the choice of law was apparent, we deem it more appropriate merely to determine whether there is a conflict, *i. e.,* will the choice of one law as compared to another determine the outcome. Once that is decided and the facts on their face reveal that to apply any of multiple choices of law would not constitute mere officious intermeddling, in the constitutional sense, the analysis should proceed with the law-selecting process based on the five factors [suggested by Professor Leflar] approved in *Heath.*"

204 N.W.2d at 902. These factors are:

(A) Predictability of results;

(B) Maintenance of interstate and international order;

(C) Simplification of the judicial task;

(D) Advancement of the forum's governmental interests;

(E) Application of the better rule of law.

*Id.* It is significant to note that in *Hunker* the Wisconsin court avoided the unfortunate tendency to oversimplify Leflar's five factors to merely the "better law" rule.

In light of *Hunker*, this court begins its analysis by stating that a conflict of law exists in the present case. If Wisconsin law applies, there will be a limitation of recovery of damages for wrongful death and the rule of comparative negligence will apply. If Michigan law applies, there will be no limit on the recovery of damages for wrongful death and the defense of contributory negligence may be applied.

*Hunker* stated the preference for the application of forum law as follows:

"This court, as an instrument of governmental policy of the State of Wisconsin, is obligated to find the law of its forum controlling unless it can be demonstrated that the law derived from another jurisdiction is more appropriate."

204 N.W.2d at 903. 28 U.S.C. § 1346(b) reinforces this presumptive rule in favor of the law of the forum state by requiring this court to look to "the law of the place where the act or omission occurred."

This court must of course apply the whole law of Wisconsin, but certain of the considerations which would normally favor choosing the Wisconsin law were this case being tried in Wisconsin, e. g., ease of application, or better understanding of the law, and a better understanding of the probable disposition of the case by a Wisconsin state court, are not as compelling here where the case is being tried in Michigan.

Concerning the questions of limitation of damages for wrongful death, whether contributory negligence or comparative negligence is applicable, and whether the doctrines of assumption of risk and imputed negligence apply, I conclude that a Wisconsin court would choose Michigan law as being the proper law to apply to this case.

Although it has been said that in a tort action the predictability of result as a choice-influencing consideration is "minimal", since parties do not plan to be negligent, still this factor is relevant but in a different sense, as the court in *Hunker* recognized:

"[T]he question is not whether parties plan to commit an unintentional act—by definition they could not—but whether, in the event the unintended contingency occurs, the result, i. e., the legal consequence of the unintended act, comports with the predictions or expectations of the parties."

204 N.W.2d at 903. In this case, the trip began and was intended to end in Michigan. The decedents and their dependents were all Michigan residents. Insurance on the plane was presumably maintained with Michigan law in mind. The application of Wisconsin law to limit the recovery of damages for wrongful death cannot be said to be predictable to the parties. The same may be said for questions concerning whether decedents' lack of care (if any existed) might limit their recovery if, in fact, defendant is adjudged to have been negligent.

The second consideration, maintenance of interstate and international order, "requires that a state that is minimally concerned defer to the interests of a state that is substantially concerned." *Conklin v. Horner*, 38 Wis.2d 468, 479, 157 N.W.2d 579, 584 (1968). Wisconsin's interests are not so inconsequential as to make application of its law unconstitutional. However, Wisconsin's sole concern is that the accident occurred there. Application of Michigan law as to the amount of damages plaintiffs may recover would injure no important Wisconsin aeronautical safety policy. Whether plaintiffs are barred fully or only partially from recovery by any negligence on the part of their decedents will not affect the integrity of Wisconsin law relating to the standard of care to be used in its airways. Conversely, Michigan's interests in the action are substantial. Michigan has an interest in its citizens recovering damages for injuries in a uniform manner. Because

Michigan is the residence of the decedents and their survivors, its economy and law shall determine the income basis upon which plaintiffs' economic losses may be computed. Any public assistance due the survivors shall come from Michigan. On balance, the disposition of a case such as this under Michigan law will not disrupt any important Wisconsin interest or otherwise affect orderly relations between the two states.

As to simplification of the judicial task, this court, notwithstanding that for purposes of this discussion it is applying the forum law of Wisconsin, would find its task complicated by the necessity of applying Wisconsin law throughout the trial. This court's struggle with the Wisconsin rules as to choice of law stands as mute evidence of this problem.

Wisconsin's governmental interest would not be defeated if Michigan law applies. The compensatory aspect of tort liability is the most important aspect of Wisconsin tort law, *Hunker, supra.* Application of Michigan law will not preclude liability, nor will it limit liability as Wisconsin law would. In fact, Wisconsin subsequent to the date of this accident repealed its wrongful death limitation on recovery, *Snow v. Continental Products Corp.,* 353 F.Supp. 59 (E.D.Wis. 1972), and this indicates that Wisconsin's public policy now favors no statutory limits on recovery, a result which will accrue only by the application of *Michigan* law. Although Michigan's contributory negligence rule may on some instances deny plaintiffs a recovery they might otherwise have had under Wisconsin's comparative negligence rule, that is not such a compelling reason as it was in other Wisconsin cases where the Wisconsin court chose to apply Wisconsin law rather than foreign law. *See Hunker, supra* 204 N.W.2d at 906. Those cases can be distinguished in that foreign law, usually automobile guest statutes, would certainly and totally have denied compensation, while the Wisconsin law would not. Thus it is understandable that such Wisconsin courts would find their law to be the "better" law. This is not the case here, however, because such a denial of plaintiffs' claim is not certain under Michigan law.

In light of the compensatory aspects of Wisconsin tort law, and in view of the fact that Wisconsin subsequent to this case abolished its limits on compensation for wrongful death, *Snow, supra,* it is clear to this court that a Wisconsin court would find Michigan's wrongful death statute the better rule of law in terms of compensation.

The issue concerning the use of the theory of contributory versus comparative negligence is a harder question. In at least one instance a court applying Wisconsin law had concluded comparative negligence to be the "better law." *Decker v. Fox River Tractor, supra,* at 1091–92. This case may be distinguished however, because the contacts with Wisconsin were substantially greater in that case than those present here. Also, neither party has shown this court that a different result would be reached as to the standard of care if Michigan law is applied rather than Wisconsin law. Neither party has indicated in any way that such a difference exists. Finally, the "better rule of law" factor is not to predominate or be determinative. Although a Wisconsin court would likely find comparative negligence to be the better rule, I conclude that in light of all five choice-influencing factors, a court under Wisconsin law could apply Michigan's law of negligence to the instant case. A similar result may be reached as to applying Michigan rules to determine the damages plaintiffs may recover. Therefore this court will look to Michigan law on these matters.

## II. Displacement of the Tower on the Sectional Map.

The Government admits in its pleadings that the tower in question "was in an offset location on the aeronautical chart." That is, it was erroneously placed on the map. It contends, however, that such an error in location is not negligence, that the error was not a proximate cause of the accident, and that in any event plaintiffs' decedents were contributorily negligent in flying in such weather.

The United States has a duty, when publishing and disseminating aeronautical charts, to accurately represent those features it attempts to portray. Where such information is inaccurately and negligently indicated, and such negligence is a proximate cause of plaintiff's injuries, the government is liable for such damages as are caused. *Murray v. United States,* 327 F.Supp. 835 (D. Utah, 1971); *Sullivan v. United States,* 299 F.Supp. 621 (N.D.Ala. 1968), *aff'd,* 411 F.2d 794 (5th Cir. 1969). The analysis of the Supreme Court in *Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), is applicable.

> "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act."

This activity does not fall under either the discretionary function exception, *Sullivan, supra,* at 626, or the misrepresentation exception of 28 U.S.C. § 2680(h), *Murray, supra,* at 841. *Cf. Somerset Seafood Co. v. United States,* 193 F.2d 631 (4th Cir. 1951).

Defendant argues that the cartographer's art is not so refined as to make the chart a perfect representation of the hazards and landmarks which are marked. It is true that some displacement of hazard markings is necessary where the hazards are located in a congested area of the chart so that the hazards are clearly shown. Defendant has shown no such need in the present case, however. Although the displacement was, at most, ⅟₁₆ of an inch, this displacement is material because it placed the tower on the wrong side of the railroad track; such tracks are often used by VFR pilots for a navigational aid.

Defendant further argues that the purpose of aeronautical charts is not obstacle avoidance, but navigation. In both *Murray* and *Sullivan* the aeronautical charts were defective in that they indicated airports were lighted for night landings when in fact they were not. In both cases the government was found liable to parties injured when they attempted to land at night at those airports in reliance upon the charts. It is foreseeable that improper marking of a communications tower could result in injury to a pilot who is caused to become lost, or is desperately relying upon the chart in a sudden emergency not of his or her own making.

There is evidence that all pilots have been trained to use the sectional map which is printed under the supervision of the defendant. There is also evidence that there was a Wisconsin aeronautical map given to the pilot at the Land O'Lakes Airport after Mr. Krosschell at the Land O'Lakes Airport stated that he had no current Government sectional map. The Wisconsin map also had the tower misplaced as did the Government map. However, there is also evidence that the standard United States Government Sectional map was always taken along with the pilots, and one was returned in Mr. Breeden's briefcase which was returned to Mrs. Breeden following the accident. Also, the pilots arrived at the Land O'Lakes Airport without the use of the Wisconsin map. Therefore in all probability they had the old sectional in use (the one which was returned to Mrs. Breeden) which placed the tower in the same wrong location as the then current sectional. The government made no corrections on either map edition until after the date of the accident.

Even if decedents had been using the Wisconsin state aeronautical map, it has been determined that that map was copied from the Governmental Sectional Map for Green Bay, and thus the tower misplacement which it contained was carried over into the state map. Hence the United States Government is directly responsible

for any error in the Wisconsin map because of their original and continuing negligence in misplacing the tower on the Sectional Map.

The erroneous marking of this tower on the aeronautical maps normally used by pilots constitutes a real danger to pilots flying according to landmarks, and this was especially true in this particular case. It is common knowledge among pilots that light aircraft flying under visual flight rules use landmarks for navigational purposes. Therefore it is certainly foreseeable to the Government that an error in the placement of this tower would constitute a substantial and unreasonable danger to the pilots, such as these decedents, who use the Sectional Map.

In summary, the United States Government is found to be negligent in its distribution of the Green Bay Sectional Maps containing an error in tower placement as described in the findings of fact, # 25–41. Further, I determine that this negligent action resulted in an unreasonable and foreseeable risk to pilots such as decedents, and that this negligent action therefore was a substantial and proximate cause of the accident.

III. *Failure of the Government to Issue a Notice to Airmen (NOTAMs) Warning Pilots of the Misplacement of the Tower and its Unusually Long Guy-wires.*

Plaintiffs' second cause of action alleges that the Government was under a continuing duty to warn plaintiffs' decedents of the misplacement of the broadcasting tower on the Green Bay Sectional Chart. The defendant admits that it issued no such warning.

However, plaintiffs' decedents were owed no duty of notice by defendant. Although issuance of a NOTAM that the tower was misplaced on the Green Bay sectional chart might have helped call the pilots' attention to the presence of the tower, the United States had no duty to issue such a warning by NOTAM.

Similarly, although plaintiffs also alleged that defendant breached a duty owed to plaintiffs' decedents to issue a NOTAM concerning the dangerous condition caused by the unusually long guy-wires of the tower, here too the United States has no duty to issue a NOTAM in the circumstances of this case.

The reason that defendant owes no duty to plaintiffs' decedents to warn of the above-mentioned hazardous conditions lies in the nature of the notice intended to be conveyed by NOTAMs. They are intended to warn pilots of temporary hazards in the path of flight or of obstructions which are not yet charted.

As presented in the Flight Services Manual published by the FAA, (Handbook 7110.10, 1969), three methods are used to disseminate airmen information:

(a) Aeronautical charts.

(b) Flight Information Publications.

(c) Notices to Airmen.

NOTE.—*Changes occurring so rapidly that time does not permit issuance in a chart or the AIM* [Airmen's Information Manual, the most frequently used Flight Information Publication] *are publicized via Notices to Airmen.* Originators of airmen information are expected to inform the National Flight Data Center in sufficient time before the effective date of changes to permit publishing of aeronautical data on the various charts or in the AIM. *This leaves the NOTAM system free to carry out its mission—the handling of time-critical information which would affect a pilot's decision to make a flight.* . . . [Emphasis added.]

Flight Services Manual, Part I at ¶ 480. Thus the NOTAM system is intended for time-critical information likely to affect a pilot's decision whether to fly. The NOTAM system and Notices to Airmen are the same thing. Notices to Airmen are defined as follows:

*Notice to Airmen.* A notice identified either as a NOTAM or AIRAD containing information concerning the establishment, condition, or change to any compo-

nents of, or hazard in the National Airspace System, the timely knowledge of which is essential to personnel concerned with flight operations.

Id., Part I at ¶ 13. The Manual then defines NOTAM and AIRAD:

> *NOTAM.* A Notice to Airmen in message form requiring expeditious and wide dissemination by telecommunications means.
>
> *Airmen Advisory (AIRAD).* A Notice to Airmen normally given only local dissemination, during preflight or inflight briefing, or otherwise during contact with pilots.

Id., Part I at ¶ 13. These Notices to Airmen are given out by the Flight Service Station (FSS), which is an air traffic service facility which gives out weather information, conducts pilot briefings, handles en route communications, etc. Plaintiffs' decedents contacted a FSS for weather information before they took off, and plaintiffs now argue that they should have been given information concerning the broadcast tower because it would seem to fit within the definition of a Notice to Airmen, which the FSS is required to give out.

It is not clear that the type of hazard which the tower allegedly presented was the type which the Notice to Airmen was meant to communicate. Examples of NO-TAMs given in the Manual include obstruction light outages, airport light outages, and new construction such as TV towers, tall buildings, stacks, etc. (Manual, ¶¶ 562, 570). Examples of AIRADs include warnings of aircraft jettisoning fuel and bird activity. (Manual, ¶¶ 590, 594). Thus it would seem that only events which suddenly arise or are of a temporary nature are meant to be conveyed by Notices to Airmen, and that the hazard presented by the broadcast tower in this case, being of a permanent character, could have better been communicated by another type of information source.

Basically, what plaintiffs are attempting to do[1] is to allege that the FAA at a minimum should have given notice to the aircraft involved here that the broadcast tower was hazardous. Plaintiffs presented their allegation in terms of using NOTAMs. This allegation the court rejects because the intended nature of the NOTAM as set forth in the Flight Services Manual is inconsistent with such a use as plaintiffs urge.

However, even if this court presumes that plaintiffs also mean to allege that *one* of *any* of the forms of notice provided for by the FAA should have been used, the claim still must fall, for two reasons. The first is that no evidence was advanced by plaintiffs that any of the three forms of communication to pilots was intended to transmit this type of information. Second and more important, plaintiffs have failed to establish that even if there is a duty by the FAA to give notice of such a hazard as they allege this tower to be, that this information would have been received by plaintiffs' decedents, and the lack thereof was the proximate cause of the crash. For these reasons, plaintiffs have no cause of action in this regard.

## IV. FAA Permission to Construct the Tower.

■ The president and sole shareholder of the corporation which built the tower involved in the accident was a United States Congressman, Alvin E. O'Konski. This court has been presented with evidence which indicates that the congressman used his position to improperly influence the granting of the necessary permits from the FAA for the construction of the tower. Plaintiffs allege that this improper influence purges the agency of all discretionary immunity otherwise claimed by the government under 28 U.S.C. § 2680(a), and that the court therefore must step in, examine the evidence presented to the agency concerning the granting of the permits, and determine for itself whether the agency was negligent in arriving at its "no hazard to navigation" determination for the tower.

---

1. This court sympathizes with plaintiffs' thrashing about among the myriad acronyms and technical labels used by the FAA (!) in its communications.

The government responds by arguing that the FAA has no authority to prohibit the construction of such towers; that the State of Wisconsin does have such power, and that the proper forum therefore to challenge the decision that this tower presented no hazard is state court; that state law permits the construction of such towers; and that the proximate cause of the accident was plaintiffs' decedents' negligence in flying in such dangerous weather. Finally, the defendant alleges that the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a) applies, denying this court jurisdiction to pass on any alleged agency negligence.

This court views defendant's allegations that the government has no authority to prohibit the construction of such towers as being evasive and not responsive to plaintiffs' charges. It is conceded that state law permits the erection of obstacles which may interfere with low-level flight. However, this tower can hardly be classified as a normal use of the land hazardous to only low-flying aircraft. It constitutes a major intrusion into the navigable airspace over Wisconsin. Similarly, this court grants that Wisconsin has the right under its statutes to regulate such towers, and to determine that they afford no hazard to navigation. However, by federal regulation there must be an investigation conducted by the FAA into the effect such a tower would have on navigation, 14 CFR § 77.1 *et seq.*[2] This cause of action concerns the federal investigation of this tower, and it is this upon which the court focuses its attention.

It is true that neither the FAA nor the FCC has direct authority to ban construction of such a tower, *Illinois Citizens Committee for Broadcasting v. FCC,* 467 F.2d 1397 (7th Cir. 1972). However, as noted above, the FAA does have authority to require that it be notified of such construction, and to make a determination as to whether the construction will be an obstruction presenting a hazard to air navigation. This determination is then passed on to the

FCC when the obstruction involves a broadcast tower, and if it is determined to be a hazard to navigation, the FCC will consider this factor in taking further action, 47 CFR § 17.4(e). This further action includes the authority to deny a license to operate the tower for communications purposes. *See Chronicle Publishing Co. v. FCC,* 125 U.S. App.D.C. 53, 366 F.2d 632 (1966). Because, as Congressman O'Konski stated in a letter to the agency, no one "wants to build a monument to himself," the denial of a broadcast license in effect prohibits construction of such a tower. *See Airline Pilots Ass'n Int. v. Dept. of Transportation, FAA,* 446 F.2d 236 (5th Cir. 1971). Thus the FAA and the FCC acting in concert do have authority to indirectly ban the construction of such towers. It behooves the court to now determine whether this authority was used correctly.

As set forth in finding of Fact # 4, the FAA issued a statement explaining its determination that the tower presented no hazard to navigation. This statement *admits* that "such structure will be a definite hazard to non-IFR general aviation aircraft because of aviation activity in the area when ceiling and visibility are down." Yet the FAA went on to justify its decision by stating that "television is also very important to the many residents and tourists in the north." It is incredulous that the agency would base its determination of "no hazard to navigation" on the need for television in the north woods, while at the same time admitting the hazard which the obstruction presents. Clearly the FAA based its determination upon an irrelevant criterion. Nowhere is the FAA mandated to consider the need for television. Its primary duty is owed to the pilots and passengers of this country, especially in this instance to the private aircraft pilots whose interests were most seriously endangered by the construction of such a broadcast tower. This FAA communication, coupled with the evidence presented to this court of improper political influence brought to bear upon the

---

**2.** This court expresses no opinion however as to the effect such federal regulation may have on pre-empting the regulation by the State of Wisconsin of its airspace.

agency by one who had a major financial interest in the project, leads this court to conclude that the FAA was negligent in determining that the tower in question presented no hazard to navigation of small aircraft in the vicinity.

The government argues that this determination is of a discretionary nature, and therefore the court has no jurisdiction to review the agency's action, citing 28 U.S.C. § 2680(a) as the pertinent exception to the Federal Tort Claims Act.

■ This court does not proceed to review the FAA's determination under the theory advanced by plaintiffs. The fact that the agency abused its discretion, even by yielding to improper political pressure, is *not* sufficient to permit the court to conduct a *de novo* review, because 28 U.S.C. § 2680(a) specifically excepts discretionary functions "whether or not the discretion involved be abused."

■ Instead, the court determines that there was no exercise of discretion within the FAA's determination which qualifies for exemption under § 2680(a). The Sixth Circuit in *Downs v. United States,* 522 F.2d 990 (6th Cir. 1975), provides an analysis of the discretionary function exception which is applicable here. *Downs* involved an FBI agent who was sued for negligence in his handling of an airplane hijacking. Because the FBI had a policy on handling these matters, which the defendant did not follow, the court ruled that the discretionary function exception did not apply, because the mere exercise of judgment by defendant was not enough; Congress only meant to exempt the use of discretion when it was exercised in the making of government policy.

> "Judgment is exercised in almost every human endeavor. It is not the mere exercise of judgment, however, which immunizes the United States from liability for the torts of its employees. . . . If exercise of judgment were the standard for applying the discretionary function exception, a host of cases have been wrongly decided. [The court cites *Indian Towing Co., Inc. v. United States,* 350

U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), among others.]"

522 F.2d at 995. The court then cites 28 U.S.C. § 2680(a):

> "The provisions of this chapter and section 3146(b) [Federal Tort Claims Act] shall not apply to—(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

*Id.,* at 996. The court continues:

> "In our view, the first part of this section immunizes the Government from liability for the actions of a Government employee who is exercising due care in implementing a government policy as set forth in a statute or regulation. The second part of the provision, the discretionary function exception, immunizes Government employees while they are formulating policy."

*Id.* The court then reviews the legislative history of the section, and concludes:

> "The functions which this sparse legislative history indicates were to be excepted are those involving policy formulation, as distinguished from the day-to-day activities of persons not engaged in determining the general nature of the Government's business."

*Id.* Thus the determining factor with regards to this exception is whether the employee was engaged in policy-making, or whether he was implementing a policy.

Applying this distinction to the present case, the court concludes that the FAA was implementing policy when it made the determination that the tower presented no hazard to navigation. The policy had already been determined and enunciated through federal regulation at the time of this determination. *The FAA was bound to follow the due care standard in its implementation of this policy.*

As mentioned, this court determines that the FAA breached its duty of due care in its review of the hazards posed by the tower. It is also clear that the FAA owed this duty of due care to those pilots who would fly through the area, including plaintiffs' decedents. The next question which must be examined is whether the negligence was the proximate cause of this accident.

The broadcast tower was admitted to be hazardous by the FAA (finding of fact # 44). In examining the objections filed with the FAA, it is obvious that these were specific objections for the most part. The objections were: (1) that the tower was unusually tall; (2) that the supporting guy-wires were extremely long and being unmarked, would be nearly invisible coming out of the clouds in marginal weather; and (3) the tower was located in an area frequently used by private airplanes, both because it was located on the direct route between Iron Mountain and Rhinelander, and because it was near identifiable navigational aids, a railroad and highway, which were used by VFR pilots.

The court recognizes that there are two other towers in Wisconsin similar in height to this one (finding of fact # 27). However, examination of aeronautical maps of Wisconsin indicates that towers of this height are unusual. Because of the great height of the tower, the guy-wires used to support it necessarily were located a great distance away from the tower. The fact that these wires were unmarked heightens the danger they present to small planes. The fact that the area is frequently used by small aircraft is a consideration. Weighing the testimony contained in the objections received by the FAA, the unusual height of the tower and the breadth of its supporting cables, this court concludes that the tower is a hazard to air navigation in the area, that this hazard was known to the FAA at the time of its determination, that nonetheless the corporation obtained permission for the tower to be built, and that an accident such as occurred to plaintiffs' decedents was foreseeable to the FAA as directly resulting from the agency's action.

The government's main defense to both this allegation and the entire case presented by plaintiffs is that whatever duty was owed these men in the plane, their contributory negligence in flying into such dangerous weather was the proximate cause of the accident. The court cannot find evidence of any such contributory negligence. There is evidence that the weather was marginal on the date of the accident, enough so that several other pilots preferred to wait until the weather cleared before taking off. The court also is cognizant of the fact that flying within the legal minimums does not necessarily constitute due care in certain circumstances. However, the weather is not the primary cause of this crash. The only influence the weather had was to force the decedents' plane to fly at an altitude much lower than they normally would have done, thus forcing them to go around the tower rather than over it; the weather also obscured the guy-wires to an extent that a large and potentially hazardous obstruction was transformed into a fatal hazard.

There were conflicting eye-witness reports of the accident. One witness standing approximately ¾ to one mile from the tower did not see the crash, but heard it. This does not mean that the plane was in the clouds at the time of the crash however, because it is possible that a cloud was between this witness and the accident. Additionally, and more important, a second witness over one mile away did see the accident. Both witnesses were able to see the tower itself, at least that part that was below the clouds. Finally, plaintiffs' decedents contacted the Land O'Lakes airport when they were approximately five miles from the scene of the accident (finding of fact # 20), and reported three miles visibility. Because of the lack of sufficient evidence to the contrary, this court is persuaded that the men were exercising enough due care to rebut any allegations of contributory negligence. In fact, it is probable that the plane did see the tower itself. The proximate cause of the accident was

the fact that the plane flew into the guy-wires of the tower which was negligently permitted to be built by the FAA, and which lacked any type of warning lights or markings.[3]

### V. Failure to Require Markings or Lights on the Guy-wires.

 Plaintiffs argue on behalf of this last allegation that the FCC regulations concerning the lighting of broadcast towers, 47 CFR § 17.1 *et seq.*, require that lights be placed on the guy-wires. They claim that the definition of "antenna structures" is broadly worded:

"The term antenna structures includes the radiating system, its supporting structures, and any appurtenances mounted thereon."

47 CFR § 17.2(a) (1967), and that "supporting structures" includes antenna guy-wires. Thus the regulations requiring marking and lighting of "antenna structures" should be read as requiring the marking and lighting of guy-wires since these by definition are part of the antenna structure.

The defendant argues that the determination of whether or not to require lighting on antenna guy-wires is a discretionary function of the governmental agency, and thus is beyond the jurisdiction of this court to review.

Although the language of § 17.2(a) appears to indicate that guy-wires are indeed part of the antenna structure, other sections pertaining to lighting of the antenna structure seem to apply a much narrower interpretation. In § 17.17(c), the regulation requires that all antenna structures exceeding 200 feet above ground be painted and lighted. The regulation refers to antenna structures in general. Likewise, § 17.23, which requires alternating bands of orange and white paint, does not help to interpret

the definition of "antenna structures." However, § 17.35(a)(3), which deals specifically with antenna structures over 1650 feet tall, requires that the requisite light shall be enclosed in an aviation red obstruction light globe which must be installed *on each outside corner of the structure.* § 17.-35(a)(2), which requires flashing beacons be installed at intervals along the antenna, specifically requires that the light *"shall be installed in . . . position within the tower proper. . . ."*

Plaintiffs' efforts to persuade the court that these regulations mean that the red light globes should be placed on the guy-wires strain the rational meaning of the language used in the regulation. It is granted to plaintiffs that the definition of "antenna structure" appears to encompass guy-wires within its meaning. However, the specific language of the lighting regulations contradicts this impression. It is difficult to understand what is meant by an "outside corner" of a guy-wire; if by "outside corner" the globe was meant to be placed at the base of the wire on the ground, it would be of little aid to aircraft. The description only acquires a rational meaning when it is viewed as applying to the antenna structure proper, rather than to its supports.

This interpretation is reinforced by the language of an accompanying lighting requirement which specifically requires a flashing beacon to be installed within the tower proper. Although such language was available for use in describing the placement of the red globes as well, I attribute the difference in description to the different mechanics of the lights—the globe is a constant red light, and being attached to each corner the tower is visible for 360°; the beacon is a flashing, and oftentimes revolving light, which attracts greater at-

---

3. Defendants attempted at trial to construct a theory that icing may have been the cause of the accident. Because this plane was being flown VFR, and hence flew below the ice-bearing clouds from which the other planes accumulated ice, the defendant has not presented any evidence capable of supporting this theory, and it is rejected.

Likewise the fact that the plane was flying at 450 feet above the ground, in violation of the 500 foot minimum near buildings, 14 CFR § 91.79(c), is not a proximate cause of the accident, *see, McCauley v. United States*, 470 F.2d 137 (9th Cir. 1972).

tention and hence does not require placement of one on each corner, but instead may be placed "within the tower proper."

There was also testimony from plaintiffs' witness that the FAA does not require the lighting or marking of guy-wires. This court shall give deference to an agency's interpretation of its own regulations, absent a plain error or inconsistency within a regulation. *Immigration and Naturalization Service v. Stanisic*, 395 U.S. 62, 89 S.Ct. 1519, 23 L.Ed.2d 101 (1969); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Compton v. Tennessee Department of Public Welfare*, 532 F.2d 561 (6th Cir. 1976); *Detroit Edison Co. v. U. S. Environmental Protection Agency*, 496 F.2d 244 (6th Cir. 1974); *Usery v. Babcock & Wilcox Co.*, 424 F.Supp. 753 (E.D.Mich.1976).

Even were the regulations found to require such markings on the guy-wires, this court cannot find an agency negligent where it has discretion in the enforcement of its various regulations, *see, e. g., Gercey v. United States*, 409 F.Supp. 946 (D.R.I.) *aff'd* 540 F.2d 536 (1st Cir. 1976); *Hoffman v. United States*, 398 F.Supp. 530 (E.D. Mich. 1975), nor can it require the agency to establish greater standards than those which already exist, *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953); *Miller v. United States*, 522 F.2d 386 (6th Cir. 1975). Notwithstanding these discretionary privileges of an agency, this court is of the opinion that no such regulations for guy-wires existed at the time of the accident.

However, even if there was no regulation applicable which required the marking or lighting of the guy-wires of this tower, the FAA has a statutory duty to provide for the safety of the aircraft, 49 U.S.C. § 1348(a). This they failed to do in this instance where the length of the guy-wires and the position of the tower indicated that the tower would present a danger to air navigation, the FAA clearly had notice of this fact, and had the authority to require additional lighting.

This negligent omission is not within the discretionary function exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a), because there has been no showing by the government that there was any exercise of discretion resulting in the fact that the guy-wires were unmarked. To come under the discretionary judgment exception, there must first be evidence of some exercise of discretion, *see* Peck, "Federal Tort Claims Act: A Proposed Construction of the Discretionary Function Exception," 31 *Washington Law Review* 207, 225–26 (1956).[4] Further, there was no evidence by the government that such a forebearance to regulate such guy-wire marking, even if it was arrived at by an explicit exercise of agency discretion, was in any way intended to further a legitimate governmental function. The government carries a heavy burden when it argues that a failure to act was an exercise of discretion, especially in light of the statutory mandate to provide for the safety of aircraft, 49 U.S.C. §§ 1348(a), 49 U.S.C. § 1655(c), 47 U.S.C. § 303(q).[5] There

---

**4.** The language of 28 U.S.C. § 2680(a) supports this interpretation. The statute excepts claims ". . . *based upon* the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . ." [Emphasis added.] This language differs from § 2680(b), which speaks of claims ". . . arising out of . . . ." exercise or performance.

"If the acts or omissions on which the plaintiff bases his complaint were not acts specifically directed, or risks knowingly, deliberately, or necessarily encountered, in the discretionary determination to perform or not to perform the function or duty, his complaint is not 'based upon' the performance or failure to perform such functions and duties. It is, instead, based upon acts or omissions which had nothing to do with the functions or duties. They were acts or omissions [which were] irrelevant to achievement of the governmental purposes . . . ."
Peck, *supra*, 31 *Wash.L.R.* at 228.

**5.** 49 U.S.C. § 1348(a) reads:

"(a) The Administrator [of the FAA] is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. . . ."

is ample evidence that a statutory duty to provide for the safety of pilots has been violated. There is no evidence that there was an exercise of discretion here, no policy was every formulated with regards to marking guy-wires. The regulations on lighting and marking of towers are ambiguous as to guy-wires. It cannot be clearly stated that the government either intended to exclude or include them. There simply has been no agency action at all.[6] It was the failure to exercise this discretion, and not any exercise *per se*, which this court finds culpably negligent, especially in light of the statutory authority given the FAA and FCC to provide for the safety and regulation of aircraft to avoid tragic situations such as is involved here.

To find that the government was legally negligent in not requiring lights or other markings on these guy-wires is not to rule that the government was negligent in not requiring lights on all towers. That issue is not now before this court. The court recognizes that this case approaches the limits of demarcation between judicial and legislative functions. However, in this particular case the facts are such that they compel an exercise of *some* discretion.

This tower was extraordinarily high and the wires supporting it were extremely long and far-reaching. Because of the long guy-wires on the tower, it is manifest to anyone examining the situation that the regular notices to all pilots by the FAA warning them of the general hazard of guy-wires would be inadequate warning in this instance.

Additionally, the effect of minimal weather conditions on visibility (as well as the necessities presented by nighttime flying) prompted the FAA to recommend and the FCC to require particular types of lighting on these towers to avert collision.[7] Thus the FAA was aware of the problems of VFR pilots in bad weather. Of course the standard safeguard is to only fly when one is able to see all obstructions. This is the intent of the FAA regulation requiring one mile visibility as a minimum, and this ability to see is the premise underlying VFR (*Visual* Flight Rules) flying. However, in the particular facts of this case, this line of sight requirement is inadequate. The danger arises because a narrow unmarked cable or guy-wire which descends out of the clouds is practically invisible. Defendant has argued that the weather, and not the failure to mark the guy-wire, is the proximate cause of the accident. As mentioned above, however, that is only partially true. There is no evidence that the decedents did not see the tower. Rather, I have determined that it is probable that they did. What was not seen were the guy-wires, and this was because of the effects of the weather upon visibility.

Finally, the FAA improperly permitted the tower to be built with its sanction in an area which it knew would involve the fre-

---

49 U.S.C. § 1655(c) merely transfers the functions of the FAA from the Department of Defense to the Department of Transportation. 47 U.S.C. § 303(q) reads:

"[The FCC] from time to time, as public convenience, interest, or necessity requires, shall—

(q) Have authority to require the painting and/or illumination of radio towers if and when in its judgment such towers constitute, or there is a reasonable possibility that they may constitute, a menace to air navigation."

6. There apparently was started some investigation by the FAA into whether guy-wires should be included in the regulations. This was indicated in a statement by the FCC at the same time 47 C.F.R. § 17.2 was issued in its present form:

"A suggestion was made that guy-wires be marked. This has not been adopted since the FAA requirements do not specify such mark-

ing. It is understood that the FAA has this project under special study."

32 F.R. 11268 (1967). However, the inquiry was apparently dropped before a determination was made. In any event, no evidence of such an FAA study has been presented to this court.

7. The FAA in Advisory Circular (AC 70/7460–1) dated 2/29/68 states the purpose of the lighting requirements:

10. *PURPOSE* The purpose of lighting a structure which may be an obstruction to air commerce is to warn airmen during the hours of darkness and during the periods of limited daytime light intensity of its presence. To accomplish this objective, it is necessary to provide adequate lighting on the obstruction in a manner which assures visibility of such lighting from aircraft at any normal angle of approach.

quent use of nearby landmarks by VFR pilots for navigation.

The FCC has provided for such an extraordinary situation as is outlined above by allowing for the use of its discretion to require additional lighting if it should so deem it necessary, *see* finding of fact # 55. Similarly, the FAA has the authority to recommend additional markings, *see* finding of fact # 56.

Because of the combined effect of the extraordinarily tall tower, the location of the tower adjacent to popular VFR landmarks, and the knowledge of the difficulty in seeing its far-ranging guy-wires, especially in bad weather, this court determines that the FAA and the FCC were negligent in not using their discretionary powers to require additional lighting or marking so as to safeguard pilots who are in the area from striking the guy-wires of such a tower, or at least to have inquired into the feasibility of marking the wires. The court further determines that an accident such as this one was foreseeable as a result of defendant's negligence, and that the negligence was a substantial and proximate cause of the accident involving plaintiffs' decedents. .

## DAMAGES

As determined previously, while this court must look to Wisconsin law in this action by reason of the Federal Tort Claims Act, Wisconsin conflict of laws cases indicate that Michigan law is the law properly applicable to this case. Consequently, Michigan law applies to the computation of damages.

There has been expert testimony that the average base income for Thomas Reminga, for purposes of computing loss of future income, was $10,135; this figure is based upon ten years previous income tax returns. Similarly the average base income for

James Breeden immediately prior to his death was $9,601,[8] again based upon the average income computed from his previous five years income tax returns.

Thomas Reminga was 44 years old at the time of his death, James Breeden was 29 years old. The computed life expectancy of a man Reminga's age according to the United States Vital Statistics is 28.2 years; the life expectancy of a 29 year-old man is 41.7 years.

While computing the total loss of future earnings arising from decedents' deaths, several factors must be taken into consideration. First, it seems probable based on the evidence submitted at trial that the men would have continued to prosper in their newly established business venture. Plaintiffs' expert economist, when figuring probable future income of the decedents, included a two percent annual increase in the decedents' income to account for an increased expertise which would be accumulated over the years, and an increased probability of success in their business if it had continued under their operation and guidance. The court accepts this relatively modest figure into its computation of the award to be made to plaintiffs for lost future income.

Also, this court believes that Michigan law allows it to consider the effect of inflation upon the loss to plaintiffs of the decedents' future earnings, *Normand v. Thomas Theatre Corp.*, 349 Mich. 50, 84 N.W.2d 451 (1957). *Cf. Willmore v. Hertz Corp.*, 437 F.2d 357 (6th Cir. 1971); Annot., 12 A.L.R.2d 611 (1950); 22 *Am.Jur.2d*, "Damages," § 87 (1965). Because inflation has become such a significant factor in the United States economy, it is only proper that it also be reflected in the damages suffered by plaintiffs. The loss of accrued income up through 1977 has been calculated according to the actual cost-of-living fig-

---

**8.** Although the tax return for the Breedens was a joint return no evidence was submitted by defendant concerning what portion of the total gross income was attributable solely to James Breeden. For this reason, the court shall presume that all the income reported in the return was the decedent's.

ures.[9] Plaintiffs' expert has estimated the future loss of earnings at a conservative rate of four percent rise in the cost of living per year. The court also adopts this figure into its calculation of damages.

Although Michigan law allows accumulation of interest on the judgment from the time of filing the complaint, M.C.L.A. § 600.6013 (1977 supp.), M.S.A. § 27A.6013, the Federal Tort Claims Act, 28 U.S.C. § 2674, prohibits such an accumulation of interest against the United States prior to judgment. Thus such an interest accumulation is excluded by the court in its computation of damages accrued prior to the date of judgment.

This court is also required by Michigan law to reduce the total amount of damages involving lost future income to present value, *Pierce v. New York Central Ry. Co.*, 409 F.2d 1392 (6th Cir. 1969). Since the statutorily determined rate of interest on such a judgment is 6%, M.C.L.A. § 600.6013 (1977 supp.), M.S.A. § 27A.6013, the court reduces the plaintiffs' awards by this amount to determine present worth.

Michigan law has not addressed the issue of whether the average gross income of the decedents should be reduced to net income to account for income taxes which would have had to be paid. However, a Michigan court has ruled that where there is no evidence submitted by defendant concerning the amount of income tax applicable to the decedent's income, the court need not face the issue of whether damages should be reduced to account for such taxes. *O'Loughlin v. Detroit and Mackinac Ry. Co.*, 22 Mich.App. 146, 177 N.W.2d 430 (1970).

The plaintiffs' expert economist in his computations has figured lost future income for the full measure of the decedents' statistical lives. However, it is generally recognized that the majority of people retire at the age of 65, and taking this figure as a mandatory retirement age, it is determined that the working life expectancy of Thomas Reminga is 21 years. Similarly, the working life expectancy of James Breeden is 36 years.

Although plaintiffs are entitled to damages for lost pension benefits which their decedents would have received after retirement had they survived, they have not submitted evidence of any such retirement benefits to the court. Thus for the court to award any such damages would be speculative, and no such factor therefore has been added to the computations.

Plaintiffs' expert has testified, however, that fringe benefits are now 35.4% of cash payrolls, and that this percentage is increasing. Because it is foreseeable that the decedents' business would have continued to prosper, based upon its short but successful debut, and that it would have made these non-cash benefits available to the decedents, the court accepts the 35% figure which plaintiffs' expert has used in computing future earnings as an approximate measure of the value of non-cash perquisites.

Accordingly, this court awards to plaintiff Gertrude Reminga $107,324 in damages accrued for lost earnings to date, $118,769 in lost future income, and $79,133 for lost fringe benefits, for a total of $305,226.

Similarly, this court awards to plaintiff Barbara Breeden Spink $101,670 in damages accrued for lost earnings, $196,793 for lost future income, and $104,462 for lost fringe benefits, for a total of $402,925.

In addition, this court awards $3,500 per year per child to the children of Thomas Reminga until they reach the age of majority, in compensation for the loss of support and services suffered by them when their father died. Since Thomas Reminga, Jr. was 21 years old at the time of the accident, Susan Reminga was 17, and Mary Reminga was 15, the court awards Susan $14,000 and Mary $21,000.

Since the plaintiffs each received the sum of $25,000 from the Cadillac Company, Inc.

9. The inflation rate for 1977 is based on an eleven month average of the Consumer Price Index.

in settlement of claims which arose from the accident this court deducts this amount from its award of damages.

Finally, the court awards Marjorie Breeden, the mother of James Breeden, $8,000 for the loss of companionship and services of her son as a result of this accident, such a loss being compensable under Michigan law, *Currie v. Fiting*, 375 Mich. 440, 134 N.W.2d 611 (1965); *Smith v. City of Detroit*, 388 Mich. 637, 202 N.W.2d 300 (1972) (overruling *Breckon v. Franklin Fuel Co.*, 383 Mich. 251, 174 N.W.2d 836 (1970).

Therefore the court awards the following damages:

Gertrude Reminga

| | |
|---|---|
| Accrued Lost Earnings 1969–1977 | $107,324.00 |
| Future Lost Earnings (reduced to present value) | 118,769.00 |
| Lost Fringe Benefits | 79,133.00 |
| Total | $305,226.00 |
| Minus Settlement | 25,000.00 |
| | $280,226.00 |

Susan Reminga

| | |
|---|---|
| Lost Support and Services | $14,000.00 |

Mary Reminga

| | |
|---|---|
| Lost Support and Services | $21,000.00 |

Barbara Breeden Spink

| | |
|---|---|
| Accrued Lost Earnings 1969–1977 | $101,670.00 |
| Future Lost Earnings (reduced to present value) | 196,793.00 |
| Lost Fringe Benefits | 104,462.00 |
| Total | $402,925.00 |
| Minus Settlement | 25,000.00 |
| | $377,925.00 |

Marjorie Breeden

| | |
|---|---|
| Support and Services | $8,000.00 |

Interest on these damages shall be computed from the date of judgment pursuant to 28 U.S.C. § 2411(b), and costs are awarded to plaintiffs, 28 U.S.C. § 2412.