HUNKER, Plaintiff and Respondent, v. ROYAL INDEMNITY COMPANY and another, Defendants and Appellants: HENRY, Defendant and Respondent.

*No. 24.  Argued January 29, 1973.—Decided March 13, 1973.*
(Also reported in 204 N. W. 2d 897.)

592

For the appellants there was a brief by *Heide, Sheldon, Hartley, Thom & Wilk* and *S. Michael Wilk,* attorneys for Republic-Franklin Insurance Company, all of Kenosha, and *Godfrey, Trump & Davidson* and *William H. Frazier,* attorneys for Royal Indemnity Company, all of Milwaukee, and oral argument by *S. Michael Wilk* for Republic-Franklin Insurance Company and *Mr. Frazier* for Royal Indemnity Company.

For the respondent there was a brief by *Albert J. Goldberg* and *Goldberg, Previant & Uelmen,* all of Milwaukee, and oral argument by *Albert J. Goldberg.*

HEFFERNAN, J. The facts of this case show substantial contacts with the state of the forum, Wisconsin, and with the state of Ohio.

In addition to being the forum, Wisconsin is the state in which the accident occurred, and one of the parties to the collision on the Wisconsin highway was a Wisconsin resident.

The plaintiff is a resident of Ohio and his action is against an Ohio insurance company which issued the liability policy in the state of Ohio to Brown, an Ohio resident, the plaintiff's coemployee and driver. Both Hunker and Brown were employees of an Ohio corporation. Their trip to Wisconsin, commenced in Ohio, was in the scope of their employment for their Ohio employer. Hunker and his employer are subject to Ohio's workmen's compensation law. An award has been made to Hunker, and he has collected it.

To the extent we can anthropomorphize the sovereign states of Ohio and Wisconsin, they are both interested jurisdictions. The conduct of persons driving automobiles on Wisconsin highways is of concern to the state of Wisconsin as a government which seeks safety for persons on its highways, the distribution of accident losses, and payment to Wisconsin creditors. As a justice-seeking jurisdiction, its courts are concerned that justice be done irrespective of the origins of the party litigants.

Ohio is interested in seeing that its citizens are not impoverished as the result of accidents and injuries occurring in the course of their employment—that the cost of work-occasioned injuries are placed upon the industry involved as a cost of doing business and spread as an additional cost to the consumer. It is concerned with industrial safety and industrial peace. It enacted a workmen's compensation law to assure that doctors and hospitals who treat those injured in industrial accidents will be compensated and that injured workmen will not be objects of charity, either of the state or of private institutions.

We cite these generalized concerns of two jurisdictions only for the purpose of demonstrating that the selection

of the law of either jurisdiction, or some aspects of the law of one jurisdiction and some aspects of the law of the other, is not, under the rationale of *Wilcox v. Wilcox* (1965), 26 Wis. 2d 617, 133 N. W. 2d 408, completely absurd. Arguably, public-policy interests of the concerned jurisdictions and the concerned parties would rationally be served by the choice of some of the law of either jurisdiction. The question that confronts this court is, however, not which jurisdiction we should select as the source of all the law to be applied to the case, but rather what aspects of the laws of either jurisdiction are most appropriately to be applied. There are substantial contacts with both Wisconsin and Ohio that could, under some circumstances, trigger the application of the law of either.

Only a single aspect of the law is at issue here—whether the Ohio law that bars suits against coemployees should be chosen for application in this case or the Wisconsin law that permits coemployee suits.

Prior to 1963, such actions were permitted by Ohio, but since that time they have been barred by Ohio statutory law. Sec. 4123.741, Page's Ohio Revised Code Annot. Under interpretations given the Wisconsin law by this court, a worker may bring suit against a coemployee for negligent conduct causing injuries in the course of their joint employment. *Zimmerman v. Wisconsin Electric Power Co.* (1968), 38 Wis. 2d 626, 157 N. W. 2d 648. The fact that the accident is covered by Wisconsin's workmen's compensation law does not bar the separate tort action. *See,* secs. 102.03 (2) and 102.29 (1), Stats.

The plaintiff has received an award under the Ohio workmen's compensation law, but since the decision of the United States Supreme Court in *Carroll v. Lanza* (1955), 349 U. S. 408, 75 Sup. Ct. 804, 99 L. Ed. 1183, it appears reasonably clear that the prior compensation award in the state of residence is not a bar to a common-law action for damages elsewhere.

The Wisconsin court can constitutionally apply its own law to the case. The application of that law will permit the cause of action for common-law negligence to proceed; the application of Ohio law would bar the cause of action by the coemployee and terminate further efforts to collect more than was awarded by the Ohio compensation authorities.

Since different law may be applied to resolve further proceedings in this case, and the selection of law will affect the outcome, this court is faced with a conflict-of-laws problem and is obliged to make a choice between the Wisconsin rule and the Ohio statute.

Illinois is also "concerned," though minimally, since the automobile was hired there and one of the insurance policies came into operation as the result of such hiring, and it could be asserted that Illinois law is available as a choice. However, as between the law of Ohio and the law of Illinois, no choice need be made, for each bars suits by coemployees. That choice would not be outcome determinative.

While a methodology could be applied that would lead to the choice of either the law of Ohio or of Illinois, the choice would be meaningless, since the result would be identical in respect to the only issue in this case. In respect to the choice of law between that of Ohio and that of Illinois, this is a "no-conflicts" case. Since their law is identical, and Ohio obviously has more substantial contacts than Illinois, our analysis will be confined to the law of that jurisdiction as contrasted with that of Wisconsin.

In the evolution of the Wisconsin conflicts law, we have arrived at a methodology of making the choice of law by relying upon an analysis of "choice-influencing considerations."

The first case in recent Wisconsin conflicts law history is *Wilcox v. Wilcox* (1965), 26 Wis. 2d 617, 133 N. W. 2d 408. In *Wilcox*, we concluded that, qualitatively as

well as quantitatively, the facts of that case pointed to the law of Wisconsin as being the one that ought to be applied. We emphasized that Nebraska was only minimally concerned in comparison to Wisconsin. We were careful, however, in *Heath v. Zellmer* (1967), 35 Wis. 2d 578, 593, 151 N. W. 2d 664, to point out that in *Wilcox* the conflict identified was not "serious." In *Conklin v. Horner* (1968), 38 Wis. 2d 468, 475, 157 N. W. 2d 579, we stated that, *"Wilcox* was an easy case that revealed no serious conflict with the laws of another jurisdiction." We have refrained, however, from labeling the *Wilcox* situation as a false conflict, since the law of either Wisconsin or Nebraska could constitutionally have been applied and the choice of law would have determined the outcome. *Wilcox* was a conflicts case. In *Zelinger v. State Sand & Gravel Co.* (1968), 38 Wis. 2d 98, 107, 156 N. W. 2d 466, it was carefully explained that "An easy choice does not make a false conflict." In *Heath,* however, we lapsed into the loose use of language by characterizing a conflict as a "true" conflict. We now deem that language inappropriate—an outcome-determining conflict either exists or it does not. It may be resolved either with ease or with difficulty. But if it is a conflict of laws, nothing is gained by so characterizing it as easy or difficult. While it would be appropriate to use the term, "true," for emphasis in contrast to a no-conflict ("false" conflict) situation, it is misleading to apply it as descriptive of a choice of law which can only be made with some degree of effort.

Whether a choice of law is easy to make or hard to resolve, the decision will be made by this court in accordance with the "choice-influencing considerations" adopted in *Heath* and followed in *Zelinger, Conklin,* and *Haines v. Mid-Century Ins. Co.* (1970), 47 Wis. 2d 442, 177 N. W. 2d 328. These considerations are proper and relevant whether the choice be easy or difficult.

In *Wilcox,* we analyzed the facts and the contacts with the forum and found that the choice was an easy one. We then concluded that Wisconsin's law ought to apply.

In *Heath,* a much more difficult case, we carefully analyzed the facts as we did in *Wilcox,* concluded that there was a difficult choice to be made, and then applied Robert A. Leflar's choice-influencing considerations. We have followed this two-step technique since *Heath.*

We deem this method of analysis a redundancy. No useful purpose is served by a preliminary analysis that only tells us our problem is difficult. Moreover, the same considerations are in part likely to be tediously reiterated in each of the two steps. More importantly, by using the two-step analysis, what appears to be an easy choice is likely to be resolved at the first stage without a proper evaluation of the five choice-influencing considerations we adopted in *Heath.*

While the *Wilcox* analysis well served its purpose where once made the choice of law was apparent, we deem it more appropriate merely to determine whether there is a conflict, *i.e.,* will the choice of one law as compared to another determine the outcome. Once that is decided and the facts on their face reveal that to apply any of multiple choices of law would not constitute mere officious intermeddling, in the constitutional sense, the analysis should proceed with the law-selecting process based on the five factors approved in *Heath.*

The choice-influencing considerations as capsulized by Robert A. Leflar in *Choice-Influencing Considerations in Conflicts Law,* 41 New York University Law Rev. (1966), 267, and in *Conflicts Law: More on Choice-Influencing Considerations,* 54 California Law Rev. (1966), 1584, were adopted by this court in *Heath,* as being appropriate guidelines for making a choice of law. They have received further consideration in Leflar, *American Conflicts Law* (1968 ed.), 233, 245. They are stated to be:

"(A)  Predictability of results;

"(B)  Maintenance of interstate and international order;

"(C)  Simplification of the judicial task;

"(D)  Advancement of the forum's governmental interests;

"(E)  Application of the better rule of law."

We have since *Wilcox, supra,* page 634, reiterated "that the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance." In *Zelinger, supra,* page 106, we referred to the presumption as "weak." In *Conklin, supra,* page 475, footnote 2, the author explained:

". . . the strength of the presumption is irrelevant, since its only purpose is to trigger the responsibility of the court to carry out the forum state's policy unless it appears that the forum state's policies are unaffected by using a nonforum rule, or unless the facts show that the contacts with the tort are so minimal that the use of forum law would be clearly the result of interloping chauvinism."

We believe this to properly state the benchmark from which analysis must begin. This court, as an instrument of governmental policy of the state of Wisconsin, is obligated to find the law of its forum controlling unless it can be demonstrated that the law derived from another jurisdiction is more appropriate. *See,* Leflar, *American Conflicts Law,* 234.

The only appropriate law, in the absence of displacing factors, is the law of the forum. Even in the face of considerations that make the forum law inappropriate, a court is not, however, unrestrained in its choice of law. It must make its selection from "among rules that are supposed to have tangible existence in states substantially connected with the facts." *American Conflicts Law, supra,* page 237, footnote 8.

When a conflict exists that may constitutionally be determined by the choice of the law other than the forum, we are obliged to make the choice in light of the choice-influencing considerations. While it may be difficult to dispel innate parochial preference, the resolution of a conflict ought not be skewed by a forum preference. Nevertheless, if the choice-influencing considerations do not indicate that the foreign law is appropriate, the conflict should be resolved by the application of forum law.

We have pointed out in *Heath, Zelinger,* and *Conklin* that, in a tort action " '. . . the choice-influencing consideration of predictability is minimal . . . since parties do not plan to be negligent or to commit torts relying [on a rule of immunity].' " *Conklin, supra,* page 478. As *Conklin* points out, however, the question is not whether parties plan to commit an unintentional act—by definition they could not—but whether, in the event the unintended contingency occurs, the result, *i.e.,* the legal consequence of the unintended act, comports with the predictions or expectations of the parties.

The first of Leflar's choice-influencing considerations deals with "Predictability of *results*" (emphasis supplied).

In this case the record shows that the parties were hired by an Ohio company that had its principal place of business at Toledo. The employment relationship and the relationship of the plaintiff to Brown, the coemployee tort-feasor, commenced in Ohio when they embarked together upon a trip for the same corporation that took them to Wisconsin. Republic-Franklin Insurance Company, which has its principal place of business in Ohio, issued an automobile liability policy in that state to Brown as the named assured. It is reasonable to assume that the parties involved in the insurance transaction expected that Ohio law would be applicable to automobile accident claims that arose under the policy. Moreover, the relationship between Hunker and Brown

as coemployees arose in Ohio, and it would appear that the reasonable expectation of the parties to the accident, and the expectation of the insurer, was that the legal consequences of an accident—a contingency planned for —would be determined by Ohio law. In the event Ohio law is applied by the Wisconsin forum, the plaintiff will be limited to the workmen's compensation award that was predictable at the home of the parties.

We are, under the standards we have adopted, also obliged to give consideration to the "maintenance of interstate and international order." "This criterion requires that a state that is minimally concerned defer to the interests of a state that is substantially concerned." *Conklin, supra,* page 479.

Wisconsin's contacts with the issues in this case are not so inconsequential or minimal that the application of its law would be an absurdity or unconstitutional or would be likely to lead to retaliatory judgments. The accident occurred on the roads of Wisconsin. The question here, however, involves not a standard of conduct, *e.g.,* "gross" negligence or "wilful or wanton" conduct as compared to ordinary care, as was the issue in *Conklin.*

While the argument has been made that it would be a breach of this forum's obligation to its citizens to tolerate a lesser standard of care by nonresidents while using the highways of this state, the issue here involves not the degree of care to be used on the highways, but Ohio's statutory bar to a cause of action, which has for its apparent purposes the implementation of its own concepts of workmen's compensation. It has nothing to do with any of the elements that affect the use of Wisconsin's highways. The fact that the accident occurred in Wisconsin, in light of the only issue in this case, has less significance than it did in *Conklin* and *Heath, supra.* If other factors lead to the conclusion that Wisconsin law should be applied, trial would be under our standards of ordinary care.

Moreover, counsel have indicated no conflict between the law of Ohio and Wisconsin in respect to the standard of care required, although there might be were we obliged to consider the law of Illinois. However, no reliance is placed upon any Illinois rules of law other than that relating to the bar of third-party suits by coemployees. Illinois contacts are so minimal in the present case that they can be disregarded, and in respect to the only important issue—the bar of the coemployee's suit—Illinois' law is the same as Ohio's. It could be said, however, that the conflict is between Wisconsin law and Ohio-Illinois law.

While we doubt that Ohio would be "outraged" by the application of Wisconsin law, it would appear that no important Wisconsin highway safety policy would be served either. In this respect, the mere occurrence of the accident in Wisconsin does not give viability to a Wisconsin concern of any consequence. The mere happening of the accident in Wisconsin leaves this state minimally concerned. Deference to the interests of the Ohio law in respect to its workmen's compensation law does not appear to be outweighed by any considerations relating to conduct on our highways. The integrity of Wisconsin's law relating to the standard of care to be used on its roads is unaffected.

We also should be mindful that the coemployees were agents of their Ohio employer. While we cannot say that interstate commerce will wither if we apply our forum law, it would appear that the flow of commerce will be freer if an employer knows that relations between his agents will be governed by the law of the place of their employment.

It appears that the consideration of the "maintenance of interstate order" is of little consequence here, and under the facts of this case, even the substantial physical contact—that this state was the situs of the accident—does not evidence an important Wisconsin policy concern.

The application of Ohio law would not complicate the task of Wisconsin judges. It is simply a bar to further proceedings on the cause of action, and Wisconsin judicial involvement with the problem would terminate upon the application of Ohio law.

It is the duty of this court to further Wisconsin's governmental interests. We have said:

". . . even when we are confronted with the law of another jurisdiction and that jurisdiction is admittedly a 'concerned jurisdiction' as determined by our analysis of relevant contacts, forum law should continue to be a primary concern of the forum court for 'Courts are instruments of state policy . . . .' (*Wilcox, supra,* p. 633), and it is the duty of a Wisconsin court to identify and effectuate Wisconsin policies." *Heath, supra,* page 597.

In *Heath, supra,* page 600, we identified the interest of Wisconsin law to be a demonstrated policy of providing "compensation for persons who are injured by negligent conduct."

In *Zelinger, supra,* page 111, we stated that a basic theory on which Wisconsin law is based is to "spread the risk to the extent of fault" and, therefore, our system of contribution furthered this basic policy and our legislatively declared policy of responsibility on the comparison of fault.[1]

In *Conklin, supra,* page 481, we emphasized that "The policy of our tort law is to compensate those who are injured by negligent acts." We also referred to the ad-

[1] Under the facts of this case, the application of Wisconsin rules of contribution between negligent tort-feasors is not at issue. We point out, however, as stated in *Wilcox, supra,* page 631, "that it is not necessary in each case to apply only the law of a single state to all phases of the lawsuit." In an appropriate case, the Wisconsin rule of contribution could be invoked although we chose the law of another jurisdiction in respect to other issues. For a general discussion, *see,* Willis L. M. Reese, *Depecage: A Common Phenomenon in Choice of Law,*" 73 Columbia Law Rev. 58 (January 1973).

monitory and deterrent effects of the imposition of Wisconsin's rules of liability. Little stress, however, was placed on these factors in comparison to the public policy served by the compensatory aspects of Wisconsin tort law. The admonitory and deterrent effect of tort liability weighed but little in the scales when compared to the compensatory aspects.[2]

---

[2] The deterrent effect, however, of tort liability should not be summarily discounted—particularly under modern automobile-accident insurance law and driver-licensing practices. In *Johnson v. Johnson* (1966), 107 N. H. 30, 32, 216 Atl. 2d 781, Mr. Chief Justice KENISON correctly stated:

"Recognition of the Massachusetts immunity will not render Massachusetts drivers less careful on our highways since their own and their wives' safety will still be jeopardized by carelessness on their part."

This cannot be interpreted, except as the naive product of wishful thinking, to mean that the imposition of liability for negligence has no deterrent effect. The true and correct statement of Mr. Chief Justice KENISON can only by gross misconstruction, and by ignoring its express content, be construed as having "rebutted" (Weintraub, *Commentary on the Conflict of Laws*, page 246) the proposition that liability for negligence constitutes some deterrent.

That it is a deterrent is one of the accepted propositions of our law. *See*, Prosser, *Law of Torts* (hornbook series, 4th ed.), p. 23, sec. 4. With the growth of the concept of no-fault and strict liability, we are, on the other hand, seeing that the deterrent effect of tort liability may be less valuable as a social tool than its use as a device for compensating the injured and spreading the risk of loss. While its value as a guide to a public-policy interest can be overemphasized, it represents an area of real concern to an affected jurisdiction.

Under modern practice the availability of insurance and the premiums paid are geared to whether or not the assured has a reasonably good driving record. In Wisconsin the failure to satisfy tort judgments triggers procedures that may cancel driving privileges. Ch. 344, Stats. Tort liability imposed on parents for the accidents of their children surely results in some parental admonitions conducive to safe driving. It is the "accident prone" (Weintraub, *supra*, page 220) drivers who are the exact targets of procedures both by insurance companies and by the state that seek to deter bad-driving conduct by refusing to insure them and eventually of depriving them of driving privileges.

In all of this court's predecessor conflicts cases the invocation of the foreign law would have resulted in the denial of any compensation to the injured parties and have left the victim without a remedy. We stated at length our concern, as a justice-seeking jurisdiction, that persons not be impoverished or their injuries go untreated because they were barred from any compensation. We also pointed out that when an injured party is uncompensated, his creditors, physicians, and hospitals will go unpaid and there exists the possibility of his becoming a state welfare charge.

Any concern over the victim going uncompensated has no substantial basis under the present facts. The bar exists under Ohio law only "on the condition that such injury . . . is found to be compensable under . . . the Revised Code." Sec. 4123.741, Page's Ohio Revised Code Annot. Hunker has been compensated, and, under the Ohio compensation law, medical creditors are reimbursed for services rendered in treating compensable injuries.

---

These procedures are set in motion by tort judgments. Under reciprocal arrangements, safety-responsibility acts may be triggered by a tort judgment in another state.

It is equally naive to assume that the invocation of the criminal law regarding the rules of the road reaches all cases of civilly culpable negligence that this state deems as a matter of policy should be prevented. We have not reached the point where every accident results in a charge for a traffic violation.

Moreover, we would be blind indeed to the world about us if we are to ignore the barrage of safety-education messages put out by insurance companies. Seat belt use is stressed (we are told by television commercials that, "To say, 'Put on your seat belt Honey,' is a tender way of telling your wife you love her."), sobriety while driving and courtesy and observance of the rules of the road are emphasized. Who but the most unsophisticated can believe that insurance company-sponsored educational programs are not directly related to the impact of tort judgments. It is clear that insurance company safety programs have had a salutary effect on industrial safety. Who without a definitive study could assert that the same salutary effect is not operating to improve our highway safety record.

While Wisconsin's law of torts permits a plaintiff to recover without limit in a tort action, even though the action is brought against a coemployee, it is doubtful that Wisconsin has any identifiable or serious governmental interest in having an Ohio resident recover more than the expressed policy of that state permits.

In *Heath, Zelinger,* and *Conklin,* we chose Wisconsin law as the "better law." In *Peterson v. Warren* (1966), 31 Wis. 2d 547, 143 N. W. 2d 560, the first case to follow *Wilcox,* we chose to apply Minnesota law. While we did not denominate that selection as a preference for the "better law," a reading of the opinion reveals the genesis of "better law" rationale as a choice-influencing consideration. *See,* Ehrenzweig, *Private International Law,* page 101.

Where we have selected Wisconsin law as the "better law," we have done so only after a careful analysis that convinced us that a choice was appropriate, *i.e.,* there was a conflict, and that the law that was not preferred by comparison with the Wisconsin law was no longer consonant with a proper resolution of the problem it sought to manage. By objective evidence we sought to determine that the acceptance of the other law was declining, and that there was a substantial trend from the rule in other jurisdictions.

Applying these standards, we found in *Heath* that "guest" laws were "anachronistic" and failed to reflect modern trends in respect to motor vehicle control and automobile accident law. We reached similar conclusions in respect to interspousal and parental immunity in *Zelinger, supra,* page 112. In *Conklin,* after a similar analysis, we chose Wisconsin's rule of ordinary care as the better law and rejected Illinois' "wilful and wanton" standard in respect to host-guest recovery. In *Zelinger, supra,* page 113, we reiterated that we would, without hesitation, if other choice-influencing considerations were in equilibrium, select the rule of another jurisdiction if

analysis convinced us that it indeed constituted the better law.

We cannot find in this case that the application of the Ohio law would be " 'a drag on the coat-tails of civilization.' " *Clark v. Clark* (1966), 107 N. H. 351, 355, 222 Atl. 2d 205.

The Ohio law that bars third-party suits is not a vestige of "a creed outworn." It is in fact a relatively new law, enacted in 1963 as a repealer to the prior statute that permitted third-party suits against coemployees. While most states permit third-party suits against coemployees, a substantial number do not. Where changes have been made in recent years, the trend appears to be toward barring such suits. Within the last twenty-five years California, Kentucky, Michigan, Ohio, and West Virginia have adopted statutes barring suits against coemployees. 2 Larson, *Workmen's Compensation Law*, pp. 174, 175, 180, Cum. Supp. 1972 p. 122; Annot. 21 A. L. R. 3d 845. These are not states that could be characterized as backward.

In 1961 an unsuccessful attempt was made in this state to amend the Wisconsin law to bar coemployee liability. *Zimmerman v. Wisconsin Electric Power Co.* (1968), 38 Wis. 2d 626, 631, 157 N. W. 2d 648. That case points out that no express language of our workmen's compensation law permits third-party actions. By judicial construction, we have interpreted the statutes to permit such actions. Since that interpretation, the law has not been amended. Because a construction of a statute by this court, with no later amendments questioning that construction, is considered to be definitive of legislative intent (*Mednis v. Industrial Comm.* (1965), 27 Wis. 2d 439, 444, 134 N. W. 2d 416), we are not free to depart from that construction. The author of the *Zimmerman* opinion indicated that an examination de novo of the statute, were it permitted, might well result in holding that third-party suits against coemployees are not au-

thorized by the statute, or at least that such a construction could reasonably be arrived at.

It is enough to say that there appears to be no perceptible trend toward the abolition of the statutory bar, and that in Wisconsin the judicial gloss that found no bar is based on principles of statutory construction and not upon any consideration of the superiority of one rule over the other.

The Ohio rule is consistent with basic workmen's compensation policy that the cost of industrial accidents should be allocated without regard to fault and should be passed on as industrial cost to those who use the product. *See, Val Blatz Brewing Co. v. Industrial Comm.* (1930), 201 Wis. 474, 230 N. W. 622, for an extended discussion of the basic policy which underpins workmen's compensation laws. Moreover, it does not seem unreasonable for a state to attempt—though how effectively could be questioned—to encourage industrial peace by not permitting fellow employees to sue one another. It is doubtful that the rule that permits a suit against co-employees necessarily serves a desirable social purpose in the event the sued and negligent employee is not covered by liability insurance. The result of such a suit may well be an empty judgment or at best the additional compensation of one employee to the impoverishment of the other.

The rationale that precludes a suit against the employer who gives up his common-law defenses is clear. It is less clear where the tort-feasor coemployee is protected. However, as pointed out in 2 Larson, *Workmen's Compensation Law,* p. 182, sec. 72.20:

". . . The reason for the employer's immunity is the *quid pro quo* by which the employer gives up his normal defenses and assumes automatic liability, while the employee gives up his right to common-law verdicts. This reasoning can be extended to the tortfeasor co-employee;

he, too, is involved in this compromise of rights. Perhaps, so the argument runs, one of the things he is entitled to expect in return for what he has given up is freedom from common-law suits based on industrial accidents in which he is at fault."

On the other hand, Larson makes the telling argument against extending immunity to the coemployee:

"If there is no strong reason of compensation policy for destroying common-law rights as to various classes of third parties, then, every presumption should be on the side of preserving those rights, once basic compensation protection has been assured. The fundamental reasons for negligence liability are the same as they always were. The injured plaintiff has a right to be made whole —not just partly whole—and the more inadequate compensation recoveries appear, the more cogent becomes this argument. Moreover, all the reasons for making the wrongdoer bear the cost of his wrongdoing still apply, including the moral rightness of this result as well as the salutary effect it tends to have as an *incentive to careful conduct* and safe work practices. [Emphasis supplied.]

"It is true that a theoretical argument can be made to explain, for example, extension of immunity to co-employees, as has been indicated earlier. But all such arguments look rather artificial when set against the practical realities involved in this kind of litigation. Except in an occasional suit against a corporate officer, most suits against co-employees would not be worth the bother except for the presence of liability insurance. If, then, an employee is injured by the negligence of a co-employee in the latter's operation of his automobile, the realistic question is whether the insurance carrier on the co-employee's automobile liability policy should enjoy a windfall, at the expense of the injured employee, by being able to interpose the defense of exclusive compensation remedy. When the matter is viewed in this light, there seems to be little modern justification for extension of tort immunity beyond the employer himself, who assumes real or potential compensation liability to the particular employee as his direct or statutory employer." 2 Larson, *Workmen's Compensation Law,* p. 226.3, sec. 72.50.

While it can reasonably be argued that a statute like Ohio's that bars suits against coemployees may not be a justice-serving rule, it is at least as true that arguments can be made that it is founded on a rational basis and serves a discernible purpose in our industrial society.

The bar of coemployees' actions does not represent merely past thinking. The trend, to the extent that it is discernible, appears to be toward barring these actions rather than permitting them. We cannot conclude, as we did in *Heath, Zelinger,* and *Conklin,* that Wisconsin's rule of liability unmistakably represents the better law.

We conclude that Ohio law is appropriately invoked under these facts. The elements of predictability tend to point to the result sanctioned by Ohio law. Wisconsin's policy of compensating injured parties and spreading the risk is in part served even though recovery is limited to the workmen's compensation award. No Wisconsin citizens or Wisconsin interests suffer because damages are not awarded on the full tort basis. No significant interest of the forum is sacrificed by the application of the Ohio law rather than Wisconsin's. We cannot say Wisconsin's law, under these facts, is the better law.

*By the Court.*—Order reversed, and cause remanded with directions to grant the defendants' motions for summary judgment.