Jasen, J.
(dissenting). I respectfully dissent. In my view, the majority overstates the significance of New Jersey’s interests in having its law apply in this case and understates the interests of New York. While I agree with much of the majority’s general exposition of the rules governing conflicts of law, nevertheless I believe that its application of these rules to the facts of this case and the resulting analysis are uneven. By casting the issue almost exclusively in terms of New Jersey’s law of charitable immunity and the policy purposes represented thereby, the majority preordains its decision that the application of New Jersey law would best serve the interests deemed relevant. A more balanced approach, which recognizes that the conflict in this case involves not only New Jersey’s law of charitable immunity but also New York’s law of charitable nonimmunity, and which accords a proper analysis and fairer significance to the policies underlying the latter, would dictate a different result. Because New Jersey’s interests in having its law of charitable immunity apply are rather attenuated in this case and, by sharp contrast, New York’s interests as the “locus-forum” in applying its rule of charitable nonimmunity are overriding — especially in light of the heinous nature of the alleged tortious conduct involved and the repugnancy of immunizing those responsible from liability — it is my view that New York law should govern this case. A brief highlighting of those factors which I believe to be most pertinent illustrates what, in my view, the majority has either understated or overlooked.
*206 New Jersey’s interests, denominated by the majority as loss-distribution, are hardly pressing under the circumstances. While it is true that laws providing for charitable immunity typically are intended to serve the purpose of protecting and promoting the charities incorporated within a state’s jurisdiction, that function is virtually irrelevant in this case. Presently, neither corporate defendant is a resident of New Jersey. The Brothers of the Poor of St. Francis (the Franciscan Brothers) has at all relevant times been a resident of the State of Ohio, a jurisdiction which recognizes only a limited charitable immunity that does not extend to negligence in the selection and retention of personnel. (Williams v First United Church, 40 Ohio App 2d 187, 318 NE2d 562, affd 37 Ohio St 2d 150, 309 NE2d 924; Cullen v Schmit, 139 Ohio St 194, 39 NE2d 146.) The Boy Scouts of America, although originally incorporated in New Jersey at the time of its alleged tortious conduct, has since relocated in Texas, a State which has wholly rejected charitable immunity. (Howle v Camp Amon Carter, 470 SW2d 629 [Tex].) While ordinarily a change in residence subsequent to the events upon which a lawsuit is predicated ought not to affect the rights and liabilities of the parties in order to avoid forum-shopping, there is no such reason to deny giving effect to the change in residence here. Rather, a defendant’s post-tort change in residence — as opposed to that of a plaintiff — is often critical insofar as it affects state interest analysis. (See, Weintraub, Commentary on the Conflict of Laws § 6.28, at 331, 334 [2d ed]; Sedler, The Governmental Interest Approach to Choice of Law: An Analysis and a Reformulation, 25 UCLA L Rev 181, 241-242; Note, Post Transaction or Occurrence Events in Conflicts of Laws, 69 Colum L Rev 843, 865.) Indeed, as this court stated in Miller v Miller (22 NY2d 12, 21-22): “To the extent that the [foreign State’s] limitation evinced a desire to protect its residents in wrongful death actions, that purpose cannot be defeated here since no judgment in this action will be entered against a * * * resident [of that State. It] would have no concern with the nature of the recovery awarded against defendants who are no longer residents of that State and who are, therefore, no longer proper objects of its legislative concern. It is true that, at the time of the accident, the defendants were residents of [that State] but they would have no vested right to the application of the law of their former residence unless it could be demonstrated that they had governed their conduct in reliance upon it (Griffith v. United Air Lines, supra) — a reliance which is neither present nor claimed in the case at bar. Any claim that [the foreign State] has a paternalistic interest in protecting its resi *207 dents against liability for acts committed while they were in [that State] should they move to another jurisdiction, is highly speculative.”
It simply cannot be disputed that New Jersey presently has a much diminished interest, if any at all, in shielding the Boy Scouts of America from liability — let alone the Franciscan Brothers which has never been a New Jersey resident. The majority does not question that conclusion, but merely states that the change in residence does not enhance New York’s interest. (Majority opn, at p 194.) While the latter may be true in the abstract, the point, of course, is that New Jersey’s interest in the application of its charitable immunity law has been substantially reduced.
Consequently, because the majority cannot in actuality rely upon New Jersey’s interest in protecting resident charities — into which category neither corporate defendant now falls — the decision today is, in effect, predicated almost exclusively upon the plaintiffs’ New Jersey domicile. What emerges from the majority’s holding is an entirely untoward rule that nonresident plaintiffs are somehow less entitled to the protections of this State’s law while they are within our borders. Besides smacking of arbitrary and injudicious discrimination against guests in this State and before our courts (see, Ely, Choice of Law and the State’s Interest in Protecting Its Own, 23 Wm & Mary L Rev 173, 186-187; cf. Tooker v Lopez, 24 NY2d 569, 575; Smith v Loughman, 245 NY 486, 491-492, cert denied 275 US 560), such a position, without more, has severely limited, if any, validity in resolving conflicts questions. (See, Neumeier v Kuehner, 31 NY2d 121,131 [Breitel, J., concurring]; Rosenthal v Warren, 475 F2d 438,445 [2d Cir]; Juenger, Choice of Law in Interstate Torts, 118 U of Pa L Rev 202, 209-210; Weintraub, supra, § 6.23, n 13; Ausubel, Conflict of Laws Trends — Torts, 19 De Paul L Rev 684,692; cf. Labree v Major, 111 RI 657,306 A2d 808; Hurtado v Superior Ct., 11 Cal 3d 574, 522 P2d 666.) This is especially so where, as here, the defendants’ contacts with the foreign State are insignificant for the purposes of interest analysis while, at the same time, the parties’ contacts with New York are so clear and direct, and the resulting interests of this State so strong.
There can be no question that this State has a paramount interest in preventing and protecting against injurious misconduct within its borders. This interest is particularly vital and compelling where, as here, the tortious misconduct involves sexual abuse and exploitation of children, regardless of the residency of the victims and the tort-feasors. (See, New York v *208 Ferber, 458 US 747, 756-760, on remand 57 NY2d 256.) Despite the majority’s denial, New York’s law in question is intimately connected to this overriding interest.
As the majority stresses, a charitable immunity law such as New Jersey’s typically serves a loss-distribution purpose reflecting a legislative paternalism toward resident charities. But that is obviously not true with regard to a rule, such as New York’s, which denies charitable immunity. Consequently, it is mistaken to adjudge the propriety of applying the latter law by giving weight only to the interests served by the former. {But see, e.g., majority opn, at p 200.) A closer attention to the specific policy purposes of New York’s charitable nonimmunity rule is essential to a more appropriate resolution of the conflict.
These purposes, to which the majority refuses to accord any significance {see, e.g., majority opn, at pp 200, 201), are preventive, protective and compensatory. Indeed, in Bing v Thunig (2 NY2d 656), where New York’s prior rule of charitable immunity was abolished, this court held that “[i]t is not alone good morals but sound law that individuals and organizations should be just before they are generous, and there is no reason why that should not apply to charitable [institutions] * * * Insistence upon * * * damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand exercise of care.” {Id., at p 666 [emphasis added].)
As previously discussed, there can be little doubt that New York has an interest in insuring that justice be done to nonresidents who have come to this State and suffered serious injuries herein. There is no cogent reason to deem that interest any weaker whether such guests are here for the purpose of conducting business or personal affairs, or, as in this case, have chosen to spend their vacation in New York. {See additionally, Korn, The Choice of Law Revolution: A Critique, 83 Colum L Rev 772, 789, n 40.) Likewise, it cannot be denied that this State has a strong legitimate interest in deterring serious tortious misconduct, including the kind of reprehensible malfeasance that has victimized the nonresident infant plaintiffs in this case. Indeed, this deterrence function of tort law, whether it be in the form of imposing liability or denying immunity, is a substantial interest of the locus state which is almost universally acknowledged by both commentators and the courts to be a prominent factor deserving significant consideration in the resolution of conflicts problems. {See, Cavers, The Choice of Law Process, at 144; Weintraub, supra, § 6.10, at 288; Horowitz, The Law of Choice of *209 Law in California — A Restatement, 21 UCLA L Rev 719, 757; Baade, Counter-Revolution or Alliance for Progress? Reflections on Reading Cavers, The Choice of Law Process, 46 Tex L Rev 141, 156; Restatement [Second] of Conflict of Laws § 145 comment c; Rosenthal v Warren, 475 F2d 438, 445, supra; Bray v Cox, 39 AD2d 299, appeal dismissed 33 NY2d 789; Hurtado v Superior Ct., 11 Cal 3d 574, 522 P2d 666, supra; Gagne v Berry, 112 NH 125, 290 A2d 624; Hunker v Royal Indem. Co., 57 Wis 2d 588, 204 NW2d 897.) While the majority mentions New York’s interest in deterrence, it dismisses that interest in short fashion by referring to the “rule in conflict” as being “loss-allocating rather than conduct-regulating.” (See, majority opn, at p 200.) Of course, there is not one but two rules at issue, and the majority’s characterization is accurate only with regard to New Jersey’s law granting immunity, not with regard to New York’s rule denying the same. (Bing v Thunig, supra, at p 666.)
Moreover, New York’s strong interest in deterring injurious misconduct, as well as in providing compensatory justice and protection to persons victimized by wrongdoing within this State, is reflected in the traditional principle of lex loci which, despite the majority’s sub silentio disavowal, remains in this State “the general rule in tort cases to be displaced only in extraordinary circumstances”. (Cousins v Instrument Flyers, 44 NY2d 698, 699; see also, Neumeier v Kuehner, 31 NY2d 121,129, 131-132, supra; Tooker v Lopez, 24 NY2d 569, 585, supra.) Indeed, despite the so-called “choice of law revolution” (see, Korn, supra), lex loci is still acknowledged almost universally as a central factor in determining the state, or states, in which the significant interests lie. (See, Restatement [Second] of Conflict of Laws § 145 [2] [a], [b]; § 146.) This rule ought not to be applied mechanically or rigidly to reach absurd results. But, neither ought it to be disregarded indiscriminately, without giving due consideration to the nature or extent of the relationship which accrues between the tort in question and a particular jurisdiction because that jurisdiction is the locus state. (See, Reese, The Second Restatement of Laws Revisited, 34 Mercer L Rev 501, 513-515.)
Here, there are no extraordinary circumstances justifying displacement of the usual rule of lex loci and the consequent disregard of New York’s interest as the jurisdiction in which the infant plaintiffs were victimized. The majority merely discounts New York’s interests as the locus state by characterizing the parties’ contacts in New York as “only isolated and infrequent”. Reliance on such characterization, however, is both factually *210 and legally misplaced. The infant plaintiffs’ visit to New York with defendants’ tort-feasor was entirely deliberate, planned and not merely transitory. They visited in order to remain for a period of time. Defendants are alleged to have permitted their tort-feasor to take the children into New York, failed to supervise him while the children were in his care in New York, authorized or sponsored the scouting activity at a campground in New York which they approved, and failed to prevent the sexual abuse of the children taking place in New York. The nexus of the parties and the alleged torts with New York can hardly be gainsaid.
This is clearly not a case in which the locus can be discounted as purely fortuitous or adventitious. (Cf. Long v Pan Am. World Airways, 16 NY2d 337, 342, n 3; Babcock v Jackson, 12 NY2d 473, 483; Kilberg v Northeast Airlines, 9 NY2d 34, 39; contrast with, Dym v Gordon, 16 NY2d 120, 125.) The infant plaintiffs and the defendants’ tort-feasor were not merely in transitu in New York. Rather, they were here for a stay, albeit a short one, and as such they deliberately submitted themselves to the protections and responsibilities of this State’s laws which should now govern the consequences of the tortious conduct committed while within New York’s borders.
Contrary to what the majority states, it is hardly clear that the parties’ only reasonable expectation was that New Jersey’s law would apply despite the contacts with this State. Indeed, it would surely seem that the parties who came to New York, and those who sponsored their visit here, would have been quite surprised to learn that their conduct while in New York, or that which had a direct impact in New York, was not governed by the laws of this State. In any event, this court has unequivocably rejected the notion that the fictional expectation of the parties should determine the choice of law in tort cases. (Tooker v Lopez, supra, at p 577; Miller v Miller, 22 NY2d 12, 20, supra; see also, Cavers, The Choice of Law Process, 119, 302, supra.) Consequently, in my view, the majority does not adequately explain why the law of New York, the locus state, ought not to govern this case.
Additionally, apart from the foregoing, I believe that this court ought not to apply New Jersey’s law of charitable immunity by reason of its incompatibility with this State’s settled public policy. Almost 30 years ago, when this court abolished charitable immunity for this State, we explained that the rule was inherently incongruous, contrary to both good morals and sound law, out of tune with modern day needs, unfair and *211 confused. (Bing v Thunig, 2 NY2d 656, at pp 663, 666-667, supra.) Surely, a rule deemed so archaic and anachronistic by this court ought not now to be given effect and, thereby, insulate defendants from whatever responsibility they should bear for the heinous acts of misconduct performed in this State.
Indeed, this court has not hesitated in the past to refuse a request to apply a foreign law considered contrary to established public policy. We have held unequivocally that where a conflict exists, this State’s public policy prevails. (Erlich-Bober & Co. v University of Houston, 49 NY2d 574, 580; see also, Zeevi & Sons v Grindlays Bank [Uganda], 37 NY2d 220, 227; Kilberg v Northeast Airlines, 9 NY2d 34, 40, supra.) Likewise, the commentators have recognized the validity, indeed the wisdom and propriety of the forum state’s refusal, on public policy grounds, to apply an anachronistic or aberrant rule of the foreign State whose law would otherwise apply. (See, e.g., Weintraub, supra, §§ 6.6, 6.27; Leflar, American Conflicts Law § 107, at 214 [3d ed]; Freund, Chief Justice Stone and The Conflict of Laws, 59 Harv L Rev 1210,1216; Paulsen & Sovern, “Public Policy” in the Conflict of Laws, 56 Colum L Rev 969; Cheatham & Reese, Choice of the Applicable Law, 52 Colum L Rev 959, 980; Restatement [Second] of Conflict of Laws § 6 [2] [b], [e]; Juenger, supra, at 230-235.) Similarly, the courts of other jurisdictions have noted the imperative of avoiding application of a foreign state’s law that is repugnant to the forum state’s public policy or that is fairly deemed to be obsolete or senseless. (See, e.g., Clark v Clark, 107 NH 351, 355, 222 A2d 205, 209; Conklin v Horner, 38 Wis 2d 468, 484-485, 157 NW2d 579, 587; see also, Tiernan v Westext Transp., 295 F Supp 1256; Skahill v Capital Airlines, 234 F Supp 906, 907; Schneider v Nichols, 280 Minn 139, 158 NW2d 254; Mitchell v Craft, 211 So 2d 509 [Miss]; Arnett v Thompson, 433 SW2d 109 [Ky].)
As this court has already held, the charitable immunity law is one which is anachronistic, obsolete and senseless, and it appears that there is virtual judicial unanimity among the States that this is so. (See, Prosser and Keeton, Torts § 133, at 1070 [5th ed]; Ann., 25 ALR2d 29; 25 ALR4th 517; see also, Restatement [Second] of Torts § 895E, providing that charities ought not to be immunized.) It is not surprising, therefore, that other courts which have considered the immunity doctrine in a conflict of laws context have held that its application should be avoided as violative of New York’s public policy. (See, e.g., Rosenthal v Warren, 374 F Supp 522, 525-526; Rakaric v Croatian Cultural Club, 76 AD2d 619; Dowd v Boy Scouts of Am., *212 NYLJ, Mar. 21,1984, p 13, col 1 [Trial Term, Kings County]; cf. Pearson v Northeast Airlines, 309 F2d 553, 561.) This court ought now to hold the same. Having already held that charitable immunity is “out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing” (Bing v Thunig, supra, at p 667 [emphasis added]), it would now be incongruous, in my view, for this court to apply it here to deny compensatory justice to nonresidents who were injured while vacationing in New York.
Finally, I find no merit to defendants’ arguments for the application of collateral estoppel. First, as the majority acknowledges, collateral estoppel is not a bar to a second action in a different forum where the latter applies its own law or refuses to give effect to the law of the first forum on public policy grounds. (See, Gilberg v Barbieri, 53 NY2d 285, 292; Restatement [Second] of Judgments § 29.) Inasmuch as New York law should be applied in this case by reason of this State’s significant interests and because application of New Jersey’s law would contravene this State’s public policy, collateral estoppel is inapplicable. Secondly, plaintiffs’ allegations, the parties, and the precise issue in this litigation — i.e., whether New York law provides plaintiffs with a remedy for injuries suffered in this State from defendants’ alleged tort-feasance — are not the same as those involved in the prior litigation in New Jersey. (See, Schultz v Roman Catholic Archdiocese, 95 NJ 530, 472 A2d 531.) Necessarily then, the prerequisites to the application of collateral estoppel have not been satisfied. (See, Ryan v New York Tel. Co., 62 NY2d 494, 500-501; Schwartz v Public Administrator, 24 NY2d 65, 71.)
For all these reasons, I would reverse the order of the Appellate Division, apply the law of New York denying immunity to defendant charities, and permit plaintiffs to proceed on their complaint.
Chief Judge Wachtler and Judges Meyer, Kaye and Alexander concur with Judge Simons; Judge Jasen dissents and votes to reverse in a separate opinion.
Order affirmed, with costs.