**Shirley PIETRANTONIO, Personal Representative of the Estate of John Pietrantonio, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 2:91–CV–231.**

United States District Court,
W.D. Michigan, N.D.

July 12, 1993.

Vincent R. Petrucelli, Petrucelli & Petrucelli, Iron River, MI, for plaintiff.

Judd R. Spray, Asst. U.S. Atty., John A. Smietanka, U.S. Atty., Marquette, MI, for defendant.

## OPINION

QUIST, District Judge.

This case was brought against the United States by the estate of John Pietrantonio under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, seeking damages for the alleged negligence of the Veterans Administration (VA) in Mr. Pietrantonio's medical care. The alleged negligence occurred when Madison, Wisconsin, VA hospital personnel failed to follow up on an indication of some kind of abnormality which appeared in chest x-rays of Mr. Pietrantonio taken in May and June 1986. This abnormality was diagnosed in 1988 as lung cancer.

This matter was tried without a jury on June 8, 1993. In addition to the testimony heard in court, the Court has watched the video *de bene* deposition of Dr. Brian H. Rank, M.D., and has examined the other material submitted to the Court at the trial. The Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 follow.

### FINDINGS OF FACT

Most of the facts are not in dispute. Mr. John Pietrantonio was born on November 19, 1925 and was a sixty year-old male in May and June 1986. He had been disabled from any work since about 1970 because of severe headaches. On May 3, 1986, Mr. Pietrantonio went to the Iron Mountain, Michigan, VA

hospital for treatment for his headaches. The doctors at the Iron Mountain facility sent Mr. Pietrantonio to the VA facility in Madison, Wisconsin. While the physicians at the Madison facility were seeking a cause for Mr. Pietrantonio's headaches, they caused Mr. Pietrantonio to have a routine chest x-ray on May 22, 1986. The chest x-ray revealed an abnormality on the right lung. The radiologist who examined the x-ray recommended that this x-ray be compared with an x-ray that was taken in 1981.

On June 8, 1986, Mr. Pietrantonio was again admitted to the Madison VA facility because of his headache condition. Another routine x-ray was taken. This time the staff radiologist made the following report:

CHEST, PA AND LATERAL: 6/26/86 The cardiac silhouette and pulmonary vasculature appear within normal limits. Again seen is an ill-defined nodular density projected posterior to the right 2nd rib anteriorly. This was present on the prior film in May 86 but not present in the film in May 81. The remainder of the lungs are relatively clear except for a small density at the right base which appears benignish. Otherwise, the chest is unremarkable.

IMP: Ill-defined density, right upper lobe. This is a new finding since 1981. This is a suspicious lesion. Would first recommend chest fluoroscopy and/or plan tomography for further localization and definition or, possibly, CT scan.

The VA physicians never located an organic cause for the headaches. More important, they did not promptly follow through on the recommendation of their own radiologist's report of June 26, 1986. Two years later, in February 1988, Mr. Pietrantonio again entered the hospital because of his headaches. At that time, his lungs were again x-rayed and further examination resulted in a diagnosis of cancer. The United States has conceded that the VA's failure to promptly follow through on the June 26, 1986, report is negligence. The United States argues that the negligence was not the cause of any injury to Mr. Pietrantonio. The United States says, in effect, that Mr. Pietrantonio would have died of lung cancer anyway.

I credit the testimony of plaintiff's expert, Dr. Rank. If the VA had promptly followed through on the recommendation of its own radiologist in June 1986, it would have discovered a Stage 1 cancerous growth on the right upper lung of Mr. Pietrantonio. At that time the cancer had not yet metastasized. The cancerous growth could have been excised by surgery, and Mr. Pietrantonio would have had a 51 to 69 percent chance of living a normal life span. Chances are a little better than 50–50 that he would have died from something besides cancer of the lung.

Instead, the VA did not diagnose the cancer until February 1988, when the physicians at the Iron Mountain, Michigan facility noted that the lesion in the upper right lung, which had been seen in June 1986, had grown and was suggestive of a neoplastic process. Mr. Pietrantonio was again sent to the Madison, Wisconsin VA facility where the lesion was diagnosed as adenocarcinoma "in keeping with a lung primary." A biopsy of the liver, failed to reveal any cancer in the liver and a CAT scan of the brain failed to show any abnormality of the brain.

I accept the testimony of Dr. Rank that, by February 1988, the cancer of the lung had progressed to the fourth stage. There was little that could be done for Mr. Pietrantonio at this time. Mr. Pietrantonio was given some experimental chemotherapy treatments, but he died on March 11, 1990. The cause of Mr. Pietrantonio's death was the spread of the lung cancer that was first seen, but not treated, in June 1986. By the time of Mr. Pietrantonio's death, the cancer had spread to his bones.

John Pietrantonio was 64 years old at the time of his death. The evidence shows that if the VA had not breached its duty to Mr. Pietrantonio and earlier treatment of his lung cancer had been successful, he could have expected an ordinary life span of an additional 15.6 years.

Mrs. Pietrantonio was deprived of companionship and services by the death of Mr. Pietrantonio and the Pietrantonio children were deprived of their father's companionship and guidance. This Court was im-

pressed with the sincerity of Mrs. Pietrantonio's and the Pietrantonio children's testimony about the close relationship they had with their husband and father. This testimony was not an act to gain the sympathy of the Court. If Mr. Pietrantonio were able to testify, this Court is sure that he would also testify as to his love for his wife, children, and grandchildren. The John Pietrantonio family was a close, warm, and loving family.

## CONCLUSIONS OF LAW

■ The plaintiff has proven a duty owed to Mr. Pietrantonio by the United States, a breach of that duty, and injury to Mr. Pietrantonio as a proximate result of the breach of duty. To be determined are damages for Mr. Pietrantonio's pain and suffering, Mrs. Pietrantonio's loss of services and companionship, and the Pietrantonio childrens' loss of companionship. Plaintiff did not ask for, and I do not award, damages to the Pietrantonio estate for John Pietrantonio's lost income or lost earning capacity. Because of his total disability, Mr. Pietrantonio was producing no income for the several years before his death.

### Choice Of Law

■ Under the Federal Tort Claims Act, the United States is "liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The whole law of the state, including its choice of law rules, must be applied. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Thus, this Court will look to Wisconsin law to determine what law should apply.

The parties agree that Wisconsin law applies to the issue of liability for malpractice. They disagree, however, as to what law should apply to the determination of damages.[1] Wisconsin limits recovery of damages in wrongful death actions. *See* Wis.Stat.Ann. § 895.04; *Rineck v. Johnson*, 155 Wis.2d 659, 456 N.W.2d 336 (1990), *cert. denied*, 498 U.S. 1068, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991). In contrast, the Michigan wrongful death

statute does not cap damages. It allows damages that are "fair and equitable" and allows recovery by children, and other next of kin, in addition to the spouse. M.C.L.A. 600.2922; M.S.A. 27A.2922. Since the laws of the two states are different and that difference would affect the outcome of this case, a conflict of laws issue exists. *Hunker v. Royal Indem. Co.*, 57 Wis.2d 588, 204 N.W.2d 897, 901 (1973).

■ Wisconsin has adopted a five-factor test for determining choice of law. The factors are:

(A) Predictability of results; (B) Maintenance of interstate and international order; (C) Simplification of the judicial task; (D) Advancement of the forum's governmental interests; (E) Application of the better rule of law.

*Hunker*, 204 N.W.2d at 902 (citations omitted).

In *Reminga v. United States*, 448 F.Supp. 445, 457–59 (W.D.Mich.1978), *aff'd*, 631 F.2d 449 (6th Cir.1980), the federal district court applied Wisconsin's choice of law factors to a case similar to this one and concluded that Michigan law should apply. *Reminga* was a wrongful death claim under the Federal Tort Claims Act in which the decedent, a Michigan resident, had been killed in a plane crash in Wisconsin caused by an error in charts provided by the Federal Aviation Administration. Among the issues in conflict was the limitation on recovery for wrongful death under Wisconsin law. *Id.* at 458. The court concluded that a Wisconsin court would apply Michigan law. *Id.*

■ With respect to predictability of results, the *Reminga* court noted that Michigan was the residence of decedent and his family and the place where the trip began and was to end. It concluded that application of the Wisconsin limitations on wrongful death was not predictable for plaintiffs. In the instant case, Mr. Pietrantonio and his family resided in Michigan and Mr. Pietrantonio obtained all of his primary medical care

---

1. The Wisconsin Supreme Court has held that "it is not necessary in each case to apply only the law of a single state to all phases of the lawsuit."

*Wilcox v. Wilcox*, 26 Wis.2d 617, 133 N.W.2d 408, 415 (1965).

**462**

at the Iron Mountain VA facility. He did not go to Wisconsin except by referral from his Michigan doctor. Thus, he did not choose Wisconsin as the source of his medical care and he and his family would not have expected Wisconsin law to determine their rights. On the second factor, maintenance of interstate and international order, the *Reminga* court held that the law of Wisconsin should defer to the law of Michigan on the issue of recovery in a wrongful death action because "Michigan has an interest in its citizens recovering damages for injuries in a uniform manner." *Id.* This reasoning directly applies to the instant case as does the *Reminga* court's consideration of the other factors. For the reasons stated in *Reminga,* 448 F.Supp. at 458–59, this Court will apply Michigan law.

### Loss Of Chance

■ Defendant argues that any award to Mr. Pietrantonio should be limited to reflect the lost chance of survival, which plaintiff's expert quantified as 51–69%. Plaintiff maintains that a reduction for lost chance is appropriate in a medical malpractice case only where a plaintiff's chance of survival or cure was less than 50%. Michigan case law supports plaintiff's position.

■ Michigan adopted the theory of liability for lost chance of survival in *Falcon v. Memorial Hospital,* 436 Mich. 443, 462 N.W.2d 44 (1990), *rev'd in part on other grounds,* 467 N.W.2d 25 (Mich.1991). In *Falcon,* which involved the death of a mother in childbirth, testimony established a 37.5% chance of survival, but for the negligence of medical caregivers. The court held that loss of opportunity for survival should be compensated in proportion to the loss of chance. Thus, it concluded that 37.5 percent times the damages recoverable for wrongful death would be an appropriate measure of damages. *Id.* 436 Mich. at 471, 462 N.W.2d at 57. In no instance has a Michigan court applied a percentage recovery in a case in which the plaintiff established a better than 50% chance of survival, but for defendant's negligence. Where the likelihood of survival is proved to be above 50%, a plaintiff has established by a preponderance of evidence that negligence

has caused the death. *See Harvey v. Silber,* 300 Mich. 510, 520, 2 N.W.2d 483, 487 (1942) wherein the court said:

> There is testimony in the record that there was a probability that an operation would have saved Harvey's life. Therefore the negligent diagnosis could be said to have been the proximate cause of the death. See *Lippold v. Kidd,* 126 Or. 160, 269 P. 210, 59 A.L.R. 875, and annotated cases, page 884 et seq., to the effect that proof of "probability" is sufficient.

*See also Kramer v. Lewisville Memorial Hospital,* 858 S.W.2d 397, —— (Texas, 1993) (loss of chance doctrine developed to address cases in which chance of avoiding harm was improbable even before the alleged negligence occurred). The loss of chance doctrine is thus inapplicable in this case.

### Damages

■ The Court believes that the VA's negligence caused Mr. Pietrantonio pain, suffering, and mental anguish. But the amount of pain, suffering, and mental anguish caused by the VA's negligence is mitigated somewhat by the fact that Mr. Pietrantonio also suffered from severe and incapacitating headaches. These headaches are unrelated to the pain and mental anguish suffered by Mr. Pietrantonio because of the negligence of the VA. Mr. Pietrantonio would have had these headaches despite anything that the VA did or did not do. In addition, if the cancer had been diagnosed in 1986, Mr. Pietrantonio would have experienced the pain and suffering associated with lung surgery and follow-up treatment, unrelated to any negligence by the VA. Therefore, based upon all of the evidence, the Court awards plaintiff $200,000 for Mr. Pietrantonio's conscious pain, suffering, and mental anguish.

■ The premature loss of the husband, father, and grandfather of this family is not something that cannot be replaced by money damages. But money damages is the only method any court has for compensating for such a loss. In determining the amount of loss sustained by Shirley Pietrantonio, the Court notes specifically the especially loving and affectionate relationship and mutual sup-

port that existed between husband and wife. As I said earlier, this loss cannot be replaced because the loss of any human is irreplaceable. After considering all of the evidence, this Court finds that fair compensation and damages to Shirley Pietrantonio for the non-economic loss of her husband is $200,000.

■ The Pietrantonio children are all adults with their own families. However, the family remained close as is evidenced by the family events, and the companionship that they maintained with each other and John Pietrantonio. The concern of the entire family can best be exemplified by the care and comfort given to her father by daughter, Linda DeBernardi, for several weeks while Mr. Pietrantonio was on his death bed. At the same time, the Court recognizes that death comes to all of us and to some earlier than others. Based upon all of the testimony, I find that each of the four Pietrantonio children has suffered non-economic losses of $30,000.

■ Plaintiff's expert, Mr. Tessmer, testified as to the value of services lost to Mrs. Pietrantonio by the death of her husband. Mr. Tessmer based his calculations upon a certain study sponsored by Cornell University as to the average hours that an average houseowner works around the house. Mr. Tessmer then multiplied that average by the average cost of providing those services in the Pietrantonio community. I was not persuaded Mr. Tessmer's testimony. One of the problems with Mr. Tessmer's approach is that there is no evidence that Mr. Pietrantonio was average and that his house was average. In fact, the evidence is that Mr. Pietrantonio was not average. He suffered from headaches of such severity that he was unable to work at gainful employment. Also, the duties that Mr. Tessmer says take 20 hours per week would not, this Court believes, have taken Mr. Pietrantonio 20 hours per week. For example, there was no showing as to the amount of time Mr. Pietrantonio spent on lawn care. Also, tasks such as changing furnace filters and hauling trash—assuming without evidence that Mr. Pietrantonio performed those tasks—are performed only periodically and take only minutes when performed. But Mr. Pietrantonio did per-

form some services, and the Court will award plaintiffs $50,000 for the value of lost services.

In sum, for the reasons stated, judgment will be entered in favor of the plaintiff and against the United States in the amount of $570,000.